THE JACOB D. FUCHSBERG LAW FIRM, LLP
3 Park Avenue, 37th Floor
New York, NY 10016
(212) 869-3500
Attn: Alan L. Fuchsberg, Esq.
A.Fuchsberg@fuchsberg.com
*Attorneys for the Plaintiffs*

FITZPATRICK LAW, LLC
Kelly A. Fitzpatrick, Esq.
33 Bullet Hill Road, Suite 301B
Southbury, CT 06488
Kelly@FitzpatrickLawGroup.com
(203) 516-8990
*Attorneys for the Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| VALERIE JADDO, Individually and as Administrator of the Estate of STEVEN BARRIER Jr., Deceased, on behalf of the Estate and Next of Kin, and the CONNECTICUT LEGAL RIGHTS PROJECT, INC., on behalf of the population it services,<br><br>        Plaintiffs,<br><br> -against-<br><br>SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, LIEUTENANT DOUGLAS R. DIESO, STAMFORD POLICE DEPARTMENT, and THE TOWN AND CITY OF STAMFORD, CONNECTICUT,<br><br>        Defendants. | Civil Action No.:<br><br><br>**COMPLAINT AND DEMAND FOR TRIAL BY JURY AND PRAYER FOR INJUNCTIVE RELIEF** |

Valerie Jaddo ("Ms. Jaddo"), individually and on behalf of her deceased son Steven Barrier ("Mr. Barrier"), and Connecticut Legal Rights Project, Inc. ("CLRP"), by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Fitzpatrick Law, LLC., and upon information and belief, state and allege as follows:

1

## PARTIES

1.      The Plaintiff's decedent, Mr. Barrier, was a citizen of the State of Connecticut and remained in the custody of STAMFORD POLICE DEPARTMENT from October 22, 2019, to the day he died on October 23, 2019.

2.      The Plaintiff, Ms. Jaddo, as the Administrator of the Estate of Mr. Barrier and on her own behalf as Mr. Barrier's mother, seeks compensatory and punitive damages for the wrongful death of her son, Steven Barrier.

3.      The Plaintiff also seeks damages because the STAMFORD POLICE DEPARTMENT, a municipal department of THE TOWN AND CITY OF STAMFORD, CONNECTICUT, by its agents and employees violated Mr. Barrier's civil rights under the Fourth and Fourteenth Amendments of the United States Constitution 42 U.S.C. 1983, Title II of the Americans with Disabilities Act ("ADA"), Section § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, Connecticut common law pertaining to intentional and negligent tort, Article I, §§ 8 and 20 of the Connecticut Constitution, and Conn. Gen. Stat. § 7–465.

4.      The Co-Plaintiff, CLRP, is a non-profit legal services organization dedicated to protecting civil rights and improving the lives of low-income persons with psychiatric disabilities living in Connecticut, including Stamford, Connecticut.

5.      The Co-Plaintiff, CLRP, provides high-quality legal services to low-income persons with psychiatric disabilities living in Connecticut.

6.      The Defendants' unlawful actions directly injure CLRP because it frustrates their mission to protect the civil rights of persons with psychiatric disabilities, and CLRP has had to divert organizational resources and funds to counteract the Defendants' unlawful actions.

7.      The Defendant, STAMFORD POLICE DEPARTMENT, is located at 725 Bedford St., Stamford, Connecticut 06901. It operates under the control, guidance, policy, regulations, and supervision of Defendant, THE TOWN AND CITY OF STAMFORD, CONNECTICUT.

8.      The Defendant, THE TOWN AND CITY OF STAMFORD, CONNECTICUT, is a municipal government entity that manages Defendant STAMFORD POLICE DEPARTMENT, and its agents, servants, and employees, including but not limited to, individually named Defendant Officers.

9.      At all relevant times, Defendant SERGEANT MICHAEL CONNELLY was and is a Sergeant employed by Defendant STAMFORD POLICE DEPARTMENT. In his role and capacity as an agent, servant, and/or employee of Defendant STAMFORD POLICE DEPARTMENT, SERGEANT MICHAEL CONNELLY oversaw the custody of Mr. Barrier and his arrest. SERGEANT MICHAEL CONNELLY is sued in his individual and official capacities.

10.     At all relevant times, Defendant, OFFICER RHETT CONNELLY was and is an Officer employed by Defendant, STAMFORD POLICE DEPARTMENT. In his role and capacity as an agent, servant, and/or employee of Defendant STAMFORD POLICE DEPARTMENT, OFFICER RHETT CONNELLY actively participated in the custody of Mr. Barrier and his arrest. OFFICER RHETT CONNELLY is sued in his individual and official capacities.

11.     At all relevant times, Defendant OFFICER TROY C. JUDGE was and is an Officer employed by Defendant STAMFORD POLICE DEPARTMENT. In his role and capacity as an agent, servant, and/or employee of Defendant STAMFORD POLICE DEPARTMENT, OFFICER TROY C. JUDGE actively participated in the custody of Mr. Barrier and his arrest. OFFICER TROY C. JUDGE is sued in his individual and official capacities.

12.     At all relevant times, Defendant LIEUTENANT DOUGLAS R. DIESO was and is a Lieutenant employed by Defendant STAMFORD POLICE DEPARTMENT. In his role and capacity as an agent, servant, and/or employee of Defendant STAMFORD POLICE DEPARTMENT, LIEUTENANT DOUGLAS R. DIESO approved the custody of Mr. Barrier and his arrest. LIEUTENANT DOUGLAS R. DIESO is sued in his individual and official capacities.

13.     The Defendants SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, and LIEUTENANT DOUGLAS R. DIESO will hereinafter sometimes be referred to as "Defendant Officers" collectively.

14.     Upon information and belief, the Defendant Officers, as well as all other officers involved in the subject incident, were at all times relevant herein employed by and acting in the line of duty at the direction of and on behalf of the Defendant STAMFORD POLICE DEPARTMENT.

## JURISDICTION

15.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331, as raising a federal question under the Constitution of the United States of America, federal law, including 28 U.S.C. § 1343, as seeking relief pursuant to a civil right secured by an Act of Congress. The Court has supplemental jurisdiction over all other claims related to and part of the same case or controversy pursuant to 28 U.S.C. § 1367.

## VENUE

16.     Venue is proper in this District under 28 U.S.C. § 1391 as the parties reside in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## INTRODUCTION

17.     This action arises out of incidents occurring on the night of October 22, 2019, to the early morning of October 23, 2019.

18.     The STAMFORD POLICE DEPARTMENT, a municipal department of THE TOWN AND CITY OF STAMFORD, CONNECTICUT, by its agents, servants, and employees, violated Mr. Barrier's civil rights, including but not limited to the Fourth and Fourteenth Amendments of the United States Constitution 42 U.S.C. § 1983, ADA, Section § 504 of the RA 29 U.S.C. § 794, Connecticut common law pertaining to intentional and negligent tort, Article I, §§ 8 and 20 of the Connecticut Constitution, and Conn. Gen. Stat. § 7–465.

19.     Among other things, the Defendants used unreasonable and excessive force in pursuing, arresting, and detaining Mr. Barrier and were deliberately indifferent to Mr. Barrier's need for emergency psychiatric and medical health care and treatment.  The Defendants' violation of these civil rights resulted in Mr. Barrier suffering extraordinary pain, culminating in his wrongful death on October 23, 2019, which was Mr. Barrier's 23rd birthday.

20.     The Defendants' actions, detailed below, were the direct and proximate cause of Mr. Barrier's permanent and catastrophic injuries for which the Plaintiff Ms. Jaddo, as the Administrator of the Estate of Mr. Barrier and on her own behalf, now seeks relief.

21.     The Defendants violated Mr. Barrier's rights under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 by using unreasonable and excessive force in detaining Mr. Barrier through the facts detailed below.

22.     The Defendants recklessly, maliciously and wantonly disregarded Mr. Barrier's need for urgent medical care during the critical period—in which they could have saved his life—by failing to call mental health clinician services, by delaying to call emergency medical services  ("EMS"), by "drag[ing] his ass" down a hill with his hands cuffed behind his back, while also allowing his face to drag through puddles of water when they knew or should have known Mr. Barrier could be dying.

5

23.     Because of the Stamford Police Department's gross and reckless conduct, by the time the paramedics arrived at the jail, Mr. Barrier was not breathing, and his heart had stopped beating.

24.     The Plaintiff Ms. Jaddo advised the Defendants that Mr. Barrier needed urgent psychiatric care the first time they arrived at her home on the night of October 22, 2019. The Defendants failed to follow police protocol and mitigate the risk of Mr. Barrier's condition by calling for clinical services. Instead, by a preconceived indifferent and reckless plan, the Defendants returned to the home approximately one hour and forty minutes later to arrest Mr. Barrier. The Defendants violated Conn. Gen. Stat. § 17a-503 protocol by not sending Mr. Barrier to a mental health clinician or seeking EMS services at that time.

25.     Upon information and belief, the Defendants have a systemic pattern of non-compliance with Crisis Intervention Training ("CIT"), failing to provide accommodations under the ADA, escalating situations involving individuals requiring mental health services, using excessive force in such situations, and acting with deliberate indifference by violating Conn. Gen. Stat. § 17a-503, which warrants that the Defendants consult with a clinician to provide urgent psychiatric care.

26.     The Executive Summary of the "In Custody Death" Incident Review conducted by the Stamford Police Department is attached hereto, and it listed several recommendations that demonstrate the Defendants' actual failures including: (1) "That individuals taken into custody [need to] be medically evaluated prior to transporting to jail after some type of strenuous activity (foot pursuit) or stressful event;" (2) "Mental Health assistance should be provided early on in an incident…;" (3) Stamford Police should have a person dedicated for mental health who would assist officers and have a long-standing relationship with the Community Care Team; (4) All Officers should be certified in CIT; (5) All Officers should be certified in Cardiopulmonary Resuscitation ("CPR") and Emergency Medical Response

("EMR"); (6) "An Automatic External Defibrillator (AED) [should] be placed at or near the Jail area;" (7) that "not all Police Officers had [their body cameras] activated when they should have;" (8) and that "'…the agency itself failed by not providing [body camera] training "at least annually" as per the policy."' *See The Executive Summary of the "In Custody Death" Incident Review* attached hereto.

27.     Moreover, the Defendant Officers acted with a culpable state of mind and intentionally violated CIT training by acting aggressively, chasing, dragging, and taunting Mr. Barrier, which worsened his condition.

28.     The Defendants violated Mr. Barrier's rights under the Fourteenth Amendment by having a systemic pattern of applying the laws in an intentionally discriminatory manner when acting as first-responders to individuals of color having a psychiatric health crisis.

29.     The case of Mr. Barrier conflates both the discrimination on account of his psychiatric disability and his race.

30.     Upon information and belief, when the Defendant STAMFORD POLICE DEPARTMENT responds to white persons in a mental health crisis, they more often follow CIT protocol, thereby acknowledging that these persons are suffering from a medical condition and are not criminals.

31.     The Defendants' discriminatory application of the laws has caused the death or irreparable harm to a disproportionate amount of people of color with psychiatric disabilities.

32.     In addition to the above, the Defendants disproportionally hurt people of color and Black individuals the most. And the Defendants' use of excessive force and inhuman treatment toward Mr. Barrier occurred in part because the decedent was a Black person of color and/or also suffered racial and disability discrimination.

33.     The Defendants violated both Mr. Barrier's rights under the Fourteenth Amendment and the ADA because they failed to reasonably accommodate Mr. Barrier's mental health disability, wrongfully arrested him for displaying schizophrenic symptoms, and caused him to suffer unnecessary injury and indignity on account of their unlawful conduct.

34.     The Defendants also violated Mr. Barrier's civil rights, including but not limited to Article I, § 8, and 20 of the Connecticut Constitution and Conn. Gen. Stat. § 7–465, for the reasons, detailed herein.

35.     The Defendants also breached their duty of care under common law negligence, which caused the wrongful death of Mr. Barrier and the infliction of emotional harm on Valerie Jaddo.

36.     The Plaintiff Ms. Jaddo, on behalf of the Estate of Mr. Barrier and on her own behalf as Mr. Barrier's mother, seeks compensatory, exemplary, and punitive monetary damages.

37.     The Co-Plaintiff CLRP hereby seeks injunctive relief on behalf of the population it serves to modernize policies and thereby avoid future unlawful acts and omissions that occurred herein. CLRP maintains that such injunctive relief will reduce unnecessary police interactions, avoid unreasonable detentions, and prevent/reduce use of excessive force toward people with mental health disabilities.

38.     The Co-Plaintiff CLRP seeks declaratory and injunctive relief, directing the Defendants' STAMFORD POLICE DEPARTMENT and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, respond to incidents involving psychiatric emergencies by sending a community-led, non-police mental health community response team as primary-responders that meet the requirements as will be detailed below.

39.     In addition, the Plaintiff seeks declaratory and injunctive relief directing that, the Defendants STAMFORD POLICE DEPARTMENT and THE TOWN AND CITY OF

8

STAMFORD, CONNECTICUT, immediately (a)  provide necessary monetary funds to support the creation of a community-based team that responds to that crisis from a place of care and connection, not coercion and control which is described in further detail below; (b) mandate Officers to stop wrongfully arresting mentally disabled individuals for nonlethal actions that directly result from their mental disability and in first response dispatch the community-based response team in applicable situations; (c) provide access to  urgent psychiatric services that remains available for twenty-four hours a day and seven days a week for individuals who are seeking urgent psychiatric care; and (d) appoint a Special Master at the Defendants' cost to chair a committee to evaluate, oversee, manage, advise, and direct ameliorative action for psychiatric disabled residents of the City of Stamford who are vulnerable to mistreatment and unlawful arrest by the Defendants.

## STATEMENT OF FACTS

40.     Mr. Barrier was born and raised in Stamford, Connecticut. As a member of the community, Mr. Barrier was known as a kind-hearted person by his family, co-workers, and friends.

41.     Mr. Barrier qualified as a disabled person entitled to protection under Title 2 of the ADA as he was diagnosed with schizophrenia, bipolar disorder, and other psychiatric disorders.

42.     Mr. Barrier started experiencing schizophrenic symptoms at the age of fifteen. As a twenty-two-year-old, Mr. Barrier worked at the local grocery store and attended school.  Although he had a psychiatric disability that significantly impacted his life, he continued to strive toward his dreams. Many members of his community were distraught after he died in the Defendants' custody.

43.     The Executive Summary of the "In Custody Death" Incident Review conducted by the Stamford Police Department states that the Defendant Officers violated mandatory

regulations by turning off and/or never turning on their body cameras on the night that Mr. Barrier died in their custody.

44.     Before the incident, the Defendants, on numerous occasions, told Ms. Jaddo to stop calling 911 and only to call the mental health crisis hotline, CT Renaissance, or F.S. Dubois urgent mental health centers. The police department and 911 dispatchers knew or should have known that all three of these centers closed before 6:30 pm. Yet, they continuously berated Ms. Jaddo for calling 911 for emergency services when Mr. Barrier needed urgent care, and none was available.

45.     When Ms. Jaddo followed the Defendants' instructions and called the crisis hotline number to get Mr. Barrier urgent care after 6:30 pm, the hotline instructed her through an automated message to hang up and call 911 immediately.

46.     Before the incident at issue and including up to three days before the incident, Mr. Barrier's mother, Ms. Jaddo, filed several verbal and written complaints with the Defendants and requested that the Officers stop arresting Mr. Barrier and send an ambulance and a crisis management team when Mr. Barrier needed urgent care.

47.      Specifically, Ms. Jaddo wrote a letter to the Defendants after Officers brought an ambulance to take Mr. Barrier to the hospital but refused to transport Mr. Barrier to the hospital in the ambulance after an officer slipped and fell outside their home.

48.     Like many individuals living with a psychiatric disability or experiencing any kind of medical emergency, Mr. Barrier often needed urgent care after the normal operating hours for the community mental health clinics. The Defendants STAMFORD POLICE DEPARTMENT, and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, failed to provide adequate

emergency mental health services after 6:30 pm, which puts the lives of Mr. Barrier and other residents of Stamford at risk.

49.     Thus, the lack of adequate services compelled Ms. Jaddo to call 911 on multiple occasions, including on the night of the incident.

50.     Upon information and belief, the Defendants had a statistical pattern of recklessly or intentionally harming other individuals of color living with psychiatric disabilities in the same manner described herein.

51.     Upon information and belief, the Defendants have been faced with such circumstances involving white citizens suffering a mental health crisis, and the Defendants did not act toward that white person in a physically abusive or violent matter or with deliberate indifference to their health and safety. In instances with white citizens suffering mental health crises, the Defendants have followed mental crisis protocols more often.

52.     For example, three white citizens (referred to as "John Doe 1", "Jane Doe 1", and "Jane Doe 2"), whose names will remain concealed for privacy reasons, described being treated less aggressively than Mr. Barrier and other non-white individuals in similar positions by the police and that the police followed proper CIT protocols when interacting with white citizens.

53.     Specifically, the police responded less violently when John Doe 1 and/or his mother, referred to as Jane Doe 1, had many mental health crises. John Doe 1 and Jane Doe 1 have had multiple interactions with Stamford Police because John Doe 1 has a co-occurring substance use disorder, and Jane Doe 1 was diagnosed with schizophrenia.

54.    On multiple occasions, the Defendants responded less violently to domestic disputes involving John Doe 1 and/or Jane Doe 1 and did not arrest them even when they acted unlawfully.

55.    In one incident, the police responded to a domestic dispute at their home. When the police arrived, Jane Doe 1 violently fought and kicked the police, but the police did not use excessive force. In this incident, the police followed the CIT techniques to deescalate the situation, including backing up, giving her personal space, speaking softly, and transporting her to the hospital for urgent psychiatric care. Moreover, John Doe 1 acknowledged that while his mother was fighting the police, he became upset and went into the adjacent room and began smoking marijuana. John Doe 1 stated that the police were aware or should have been aware that John Doe 1 was smoking marijuana—which was an illegal drug at the time—because the smell of the marijuana was permeating into the room the police were in. However, the police did not arrest or address John Doe 1 during this time.

56.    Moreover, John Doe 1 stated that he suffered from addiction related to mental health and the police were aware because they had responded to his drug use multiple times in a less violent manner.

57.    Jane Doe 2 stated that the police told a white individual having a mental health crisis that they wanted to help them and immediately contacted urgent psychiatric care.

58.    In contrast, when Ms. Jaddo called 911 to get emergency psychiatric care for Mr. Barrier, a Black male, the Defendant Officers arrived at her home with their guns drawn and pointed at Ms. Jaddo and Mr. Barrier.

59.     Although Mr. Barrier was never armed, the Defendants continued this pattern whenever his mother called for urgent psychiatric assistance.

60.     The night of the incident, Mr. Barrier went to work at the local grocery store and returned home before 11 pm.

61.     Mr. Barrier began to resist his mother and started pointing a broom in her direction in protest to taking his medication. At this point, Mr. Barrier had heightened paranoia, memory loss, hallucinations, mental confusion, delusions, and psychosis, and he needed urgent medical assistance.

62.     During this time, Mr. Barrier's sister at 11:40 pm called 911 regarding the domestic dispute.

63.     The sister also told the dispatcher that Mr. Barrier did not have any deadly weapons but may have a broomstick.

64.     At this night hour, all the crisis mental health hotlines and the mental health centers that the 911 dispatchers told Ms. Jaddo to call, were closed. Thus Ms. Jaddo did not have the opportunity to call for emergency psychiatric help to stop or mitigate the situation before it occurred.

65.     At 11:45 pm, police officers from the Defendant STAMFORD POLICE DEPARTMENT, including the Defendant SERGEANT MICHAEL CONNELLY arrived at the home. As soon as the Defendant Officers arrived, Ms. Jaddo stepped out of the home and told the Officers that Mr. Barrier was having a psychiatric episode and needed help.

66.     By the time the police arrived, Mr. Barrier had left the premises.

67.     Ms. Jaddo told the Officers that Mr. Barrier and his sister had briefly wrestled with each other, and Mr. Barrier's sister told the police that she was not hurt and did not need a paramedic.

68.     Ms. Jaddo told the Officers that Mr. Barrier's schizophrenic symptoms had recently increased and he was having a mental health crisis.

69.     The Officers disregarded Ms. Jaddo's comments and asked her where Mr. Barrier was.

70.     Then, the Officers entered the home while the other Officers canvased the outside of the home. The Officers remained in the home from approximately 11:44 pm to 12:38 am.

71.     They listened to Ms. Jaddo explain multiple times that she needed the Officers to take her son to the psychiatric hospital because he was having a mental health crisis.

72.     While the Officers were in the home, Ms. Jaddo told them that Mr. Barrier often has these outbursts and then would wander for a while before calming down and returning home.

73.     Once the Officers finished canvassing the home, they created a plan and instructed Mr. Barrier's sister to text the Officers if Mr. Barrier returned.

74.     After the Officers left, Mr. Barrier called his mother to apologize and then returned to his home.

75.     At 1:24 am, his sister followed the Officers' instructions and texted the Officers that Mr. Barrier had returned home.

76.     The Officers returned to the home at 1:28 am.

77.     Although the Officers were on notice that Mr. Barrier needed urgent psychiatric care, they did not fill out the appropriate paperwork under Conn. Gen. Stat. § 17a-503, consult with a clinician, or transport Mr. Barrier to a hospital for an emergency mental evaluation.

78.     Nor did the Officers return with any mental health clinician services or attempt to follow CIT protocol when they arrested Mr. Barrier.

79.      The Officers did not fill out any appropriate paperwork or documentation providing details of Mr. Barrier's well-documented need for urgent psychiatric care or execute a written request for emergency examination detailing the circumstances under which the Officers took Mr. Barrier into custody.

80.     When the Officers returned to the home at 1:30 am, they improperly escalated the situation by worsening Mr. Barrier's psychiatric condition through chasing him down, screaming, "Come here, Barrier!", not attempting to defuse the situation, wrongfully arresting him, not telling Mr. Barrier that they wanted to help him, refusing to engage him in conversation to calm him, using offensive and harsh language, not giving him space by backing away, dragging him down a hill, ignoring his requests for help, watching him go into semi-consciousness on the said hill, violently placing him unmonitored in the back of a police car, refusing to call emergency medical services, and taking him into the police precinct and putting him in a jail cell in his condition.

81.     If the Officers followed the CIT protocols and followed the Jail Diversion Connecticut protocol by providing Mr. Barrier with psychiatric help instead of wrongfully arresting him, Mr. Barrier would still be alive.

82.     After chasing Mr. Barrier down, approximately three Officers, including Defendants SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, and OFFICER TROY C. JUDGE, began handcuffing Mr. Barrier's hands behind his back and then dragging Mr. Barrier down a hill when he was unable to pick himself up.

83.     The Defendants acted with gross, deliberate indifference by refusing to call a paramedic after knowing Mr. Barrier had a "syncopal episode" on the hill.

15

84.     The EMS who took Mr. Barrier to the hospital from the police department states:

"Spd [Stamford Police Department] stated they were in foot pursuit of the pt [patient] Mr. Barrier] when they finally caught him in the woods, and pt appeared to be winded and had a syncopal episode. Pt was moved to the Officer car, were pt started thrashing violently, and upon arrival at Headquarters pt became unconscious."

85.     Stamford Police Department released some of the police body camera footage on the incident in issue to the public on their online webpage; video recordings of the events described herein can be viewed at the following URL location: https://www.stamfordct.gov/public-safety-health-welfare/pages/steven-barrier-case-timeline, which is hereby referenced as part of this complaint.

86.     After Mr. Barrier had a syncopal episode, the video footage shows the Defendant Officers yelling at Mr. Barrier and demanding that he get up.  Mr. Barrier's hands are still cuffed behind his back—which would make it difficult for even a healthy person—to pick themselves up on a wet, slippery hill.

87.     However, it was evident that Mr. Barrier could not get up because he was having difficulty breathing, his body was limp, and the Officers stated they knew he had passed out.

88.     Yet the Officers continuously screamed "get up" at Mr. Barrier, although Mr. Barrier told them four times that he could not get up and once that he was too tired.

89.     After this, Mr. Barrier remained silent, immobile, and slumped on the ground.

90.     According to the State's Attorney investigation, Mr. Barrier did not resist arrest or act aggressively toward the Officers.

91.     It was clear that Mr. Barrier needed urgent help as Defendant Officers dragged Mr. Barrier and stopped multiple times to check if he was still alive.

92.     The Defendants SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, and OFFICER TROY C. JUDGE arrested Mr. Barrier and dragged him down a

hill while knowing that he had a synoptical episode.  During this time, you can hear in the audio recording Mr. Barrier is panting and struggling to breathe. Since each Officer cannot be identified in the police body camera footage, the Defendant Officers are referred to as "Officer A," "Officer B," and "Officer C" in the below conversations.  While arresting Mr. Barrier at the top of the hill, as seen in the video footage, the Defendant Officers stated the following:

> Officers A: "Stand up, stand up!"
> Mr. Barrier: "I can't."
> Officer A: "Why can't you walk?"
> Officer A: "Get up! Come on, come on, get up!"
> Mr. Barrier is heard panting and says: "I can't" (Mr. Barrier is having difficulty speaking, but he seems to try to say, "can you help me please?"
>
> Officer A: "Get up, get up, man!"
> Mr. Barrier: "I can't. I'm so tired. I can't!"
> Officer A: "You want to run? Let's run, come on, come on!"
> Officer: "Let's just drag him."
> Officer A: "Are you f****** kidding me!"
> Officer B: *uses his walkie talkie to contact the other Officers nearby and tells them* "There is no pointing of you coming up here. You are just going to get filled with mud like we are. We're going to drag him down."
> Officer A: "F*** you" or "F*** Dude" to Mr. Barrier.

93.     As the Officers indifferently and violently dragged Mr. Barrier down the hill, the Officers knew that Mr. Barrier could die. Still, they continued to allow his face to drag through the wet grass, stating:

> Officer A: "Is he breathing."
> Officer B: "Hold on. Let me check him."

94.     At this point, the Officers stop dragging Mr. Barrier, and they dropped Mr. Barrier back on to the ground. In the video footage, the Officers say:

> OFFICER RHETT CONNELLY: "put him down" (Officers chuckle.)
> Officer B: "Let me make sure. Yeah, he's still with us."
> SERGEANT MICHAEL CONNELLY: "But don't put his face in the water. Keep him out of the water." (the Officers chuckle)
> Officer C: "He picked the wrong crew."

95.     Although Mr. Barrier was dying at this time, one Officer suggests that they roll Mr. Barrier's body down the hill rather than dragging him, sarcastically stating: "We could roll him."

96.     The Officers arrive at the bottom of the hill where it meets with the Home Depot parking lot. Although Mr. Barrier is in extremis, an Officer asks the other Officers if they want a break, "do you guys want a break?"

97.     The Officers then let Mr. Barrier lie limp on the ground in the parking lot at the bottom of the hill. His hands were still handcuffed behind his back.

98.     Mr. Barrier is lying on top of his handcuffed hands on the concrete gasping for air and asking the Officers for help:

>       Mr. Barrier says: "Help me, help me please, ughh ughh."

99.     But the Officers never responded in any form to Mr. Barrier's plea for help.

100.    Officers placed Mr. Barrier into the car while he moans in pain.

101.    After Mr. Barrier is placed into the police car and before the car leaves the location, an officer who is not a named Defendant asks if they should take Mr. Barrier to the hospital instead of the police precinct. He further says, "Oh, I thought we had to. I thought we had to." Another Officer improperly responds, "No, he is psychotic. Nah, he's going to jail."

102.    During the drive, Mr. Barrier began to have a seizure. Mr. Barrier began moaning in pain, the moans became louder, but the Officer did not stop driving or check on Mr. Barrier.

103.    When the Officers and Mr. Barrier arrived at the precinct, the Officers ordered Mr. Barrier to get out of the car, but Mr. Barrier did not move because he was unconscious and slumped over in the seat.

104.     After pulling Mr. Barrier out of the police car, the Officers roughly placed him on the ground.

105.     The Stamford Police Department reported that "When taking him out of the cruiser at headquarters, Officers found that Mr. Barrier had lost consciousness."

106.     After the Officers carried Mr. Barrier's unconscious body into the booking area, they kept him handcuffed and laughed at his condition while Mr. Barrier took his last breaths on his 23rd birthday.

107.     During this time, an officer who is not a named Defendant says, "We could put him in a chair and take the handcuffs off." But the Defendant Officers ignored the suggestion and kept Mr. Barrier's hands handcuffed behind his back and left him, limp and unresponsive, shackled on the floor.

108.     The Executive Summary of the "In Custody Death" Incident Review conducted by the Stamford Police Department described the Officers' failures that led to Mr. Barrier's death:

> While in the holding area, officers were assessing the medical condition of Steven, but coming up with conflicting ways to potentially address it.  There was a lack of consensus on what to do until medical first responders arrived.  No one there immediately assumed command of the incident.  One supervisor peered in, but did not intervene further.  Another one gave an update to the commanding officer, assisted in maintaining an airway, and monitored his condition.

*See The Executive Summary of the "In Custody Death" Incident Review* attached hereto.

109.     While Mr. Barrier was in the holding cell, the Officers performed a sternum rub to see if Mr. Barrier was responsive, but Mr. Barrier never responded; thus, the Officers knew or should have known that he was unconscious and could not move. At this time, the Officers reported that Mr. Barrier's eyes had rolled to the back of his head. EMS was still not there, although the police should have, and could have, called EMS well before the officers first returned to Mr. Barrier's home.

110.     Three minutes after the Officers performed the sternum rub and verbally acknowledged that Mr. Barrier was unresponsive, one Officer smiled and laughed while leaving the holding cell where Mr. Barrier's body was lying. The Officer then joked about Mr. Barrier's worsening condition and said, "We should prick his foot and see if we can get a reaction." Another Officer said, "Or slide a credit card under the nose that will make him jump."

111.     Another Officer standing in the holding cell around Mr. Barrier's body joked that the transporting Officer's driving must have led to Mr. Barrier's unresponsiveness.

112.     Another Officer believed to be a supervisor also mocked Mr. Barrier's seizure, saying that Mr. Barrier was "bouncing his a**" in the back of the police car.

113.     Another Officer joked about Mr. Barrier being unconscious and tells the transporting Officer that his driving must have led to Mr. Barrier's worsening condition, and the other Officers laughed again.

114.     During this time, the Officers continued to mock Mr. Barrier and did not attempt to perform basic first aid or Cardiopulmonary Resuscitation ("CPR") to save Mr. Barrier's life, although that is part of their basic training.

115.     Eventually, the Officers contacted EMS. By the time EMS arrived, Mr. Barrier's heart was not beating, and he had stopped breathing.

116.     According to page 2 of the Fire Department Report, the paramedics reported that:

> "M3 and ES crews entered the lockup to find the patient propped up sitting against a wall with handcuffs on behind his back. One officer asked should they be removed. The paramedic from M3 leaned in to notice that the patient was not breathing. He felt for a pulse to find none. Capt. Davis requested that the handcuffs be removed, and they were removed right away."

117.     According to the EMS notes, if the Officers had not delayed calling a paramedic, Mr. Barrier could have survived:

"Unfortunately, given the prolonged down time, the chances of meaningful recovery at this point were negligible."

118. Mr. Barrier was pronounced dead at Stamford Hospital on his 23rd Birthday at 3:10 am.

119. The autopsy details the blunt force injuries Mr. Barrier suffered, including scattered abrasions of the head, torso, extremities, and wrist restraint marks.

120. After the Officers caused Mr. Barrier's death, hundreds of people marched and protested at the Stamford Police Department, calling for justice.

121. The Defendants SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, LIEUTENANT DOUGLAS R. DIESO, and STAMFORD POLICE DEPARTMENT, and their agents, servants, and employees acted under pretense and color of state law.

122. Said acts by the Defendants SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, LIEUTENANT DOUGLAS R. DIESO, and STAMFORD POLICE DEPARTMENT, their agents, servants, and employees, were beyond the scope of their jurisdiction, without the authority of law, and an abuse of their powers.

123. Said acts by the Defendants SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, LIEUTENANT DOUGLAS R. DIESO, and STAMFORD POLICE DEPARTMENT, their agents, servants, and employees were deliberately indifferent to Mr. Barrier's health and safety. Specifically, they were aware of, and callously ignored, Mr. Barrier's obvious need for urgent medical treatment and instead exerted excessive force on him in reckless disregard of his health and welfare.

124. Furthermore, the Defendants STAMFORD POLICE DEPARTMENT, and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, under the color of State law, acting through individuals with final policymaking authority, pursued a policy, practice, or custom in their

decision making or deliberate indifference that permitted repeated abuse and cruel and unusual punishments, which abuse and punishments continued because of their failure to report the source of the injuries adequately to medical providers outside the facility, leading directly to concealing the same and perpetuating these unconstitutional practices. This conduct caused Mr. Barrier to be subject to cruel and inhumane treatment and caused him to suffer catastrophic injuries, pain and suffering, and death.

125.   Defendant STAMFORD POLICE DEPARTMENT, its agents, servants, and employees were negligent in their employees' supervision, including the Defendant Officers. The Defendant, STAMFORD POLICE DEPARTMENT, was aware or should have been aware of their subordinates' practices and violations of detainees' rights. They condoned and permitted policies or customs under which these unconstitutional practices occurred and enabled them to continue.

126.   These acts or omissions resulted in the deprivation of Mr. Barrier's federal and state constitutional and statutory rights, conscious pain and suffering of Mr. Barrier, and his permanent and catastrophic injuries, including his death.

127.   The claims listed below are based upon but not limited to the aforementioned facts.

128.   The Defendants knew that the Mr. Barrier was in imminent harm.

129.   The Defendants knew that Mr. Barrier was an identifiable victim.

130.   It was apparent to the Defendants that the dangerous condition was so likely to cause him harm that they had a clear and unequivocal duty to act immediately to prevent the harm.

**FIRST COUNT**
**(Deprivation of Civil Rights under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)**

131.   Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

132.    The Defendants violated Mr. Barrier's right under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. 1983 by using unreasonable and excessive force in detaining Mr. Barrier.

133.    All Defendant Officers contributed to the aforesaid violations because they used unreasonable force which caused and exacerbated Mr. Barrier's critical condition.

134.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

## SECOND COUNT
**(Deprivation of Civil Rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983)**

135.    Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

136.    The Officers violated Mr. Barrier's right under the Fourteenth Amendment to the U.S. Constitution by being deliberately indifferent and willfully disregarding Mr. Barrier's need for urgent medical and psychiatric attention.

137.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

## THIRD COUNT
**(Deprivation of Civil Rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983)**

138.    Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

139.    The aforementioned facts demonstrate that the Defendants violated Mr. Barrier's rights under the Fourteenth Amendment by having a statistical pattern of applying the laws in an

intentionally discriminatory manner when acting as first-responders to individuals of color having a psychiatric health crisis.

140.    The Defendants have a statistical pattern of failing to follow CIT training, failing to provide accommodations under the ADA, escalating situations, acting violently, and acting with deliberate indifference by not using reasonable discretion under Conn. Gen. Stat. §17a-503 to provide urgent psychiatric care when responding to people of color having a mental health crisis.

141.    The Defendants failed to send a Mental Health Crisis Team to Black citizens during mental health crises and instead acted with deliberate indifference and excessive force resulting in their death. In contrast, upon information and belief, the Stamford Police Department more frequently followed CIT training and policies in similar situations involving white citizens.

142.    Because the police refuse to abide by adequate CIT training urgent psychiatric services given to white citizens, a disproportionable number of police encounters with people of color experiencing mental health crises results in death or irreparable harm. For example: In the past year, Connecticut police killed two Black men diagnosed with schizophrenia as a consequence of their refusing to follow the aforementioned regulations.

143.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

## FOURTH COUNT
**(Deprivation of Civil Rights Pursuant to the ADA, 42 U.S.C. §§ 12101 *et seq.*)**

144.    Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

145.    The Defendants violated Mr. Barrier's rights under the ADA through the facts described above.

146.    The Defendant Officers and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, violated Mr. Barrier's rights under the ADA by not providing adequate accommodations or psychiatric services because all the psychiatric urgent care facilities that the Officers and dispatchers instructed Mr. Barrier's mother to call closed before 6:30 pm.

147.    The Defendants also violated the ADA by failing to accommodate Mr. Barrier's disability through refusing to complete a Conn. Gen. Stat. §17a-503 Police Emergency Evaluation Request and transport Mr. Barrier to the hospital. They had actual or constructive knowledge that Mr. Barrier needed urgent psychiatric care.

148.    The Defendants violated Mr. Barrier's rights when they failed to follow the Connecticut CIT training standard of care, making it exceedingly more difficult for Mr. Barrier to interpret reality normally given his schizophrenia. The Officers, in chasing Mr. Barrier, being aggressive, and failing to deescalate the situation contributed substantially to his inability to interpret reality normally.

149.    The Defendants violated Mr. Barrier's civil rights under the ADA by failing to adequately train officers to make reasonable accommodations for persons suffering or perceived to be suffering in crisis from mental illness or disabilities when they are either arrested or taken into custody.

150.    The Defendants violated Mr. Barrier's civil rights by wrongfully arresting him because they misperceived the disability's effects as criminal activity, among other things.

151.    The Defendants violated Mr. Barrier's civil rights under the ADA by failing to conduct a self-evaluation of its existing policies and procedures to ensure that they were ADA compliant and that failure caused his injuries.

152.   As a result of the aforementioned ADA violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

## FIFTH COUNT
### (Deprivation of Civil Rights Pursuant to § 504 of the RA, 29 U.S.C. §§ 701 *et seq.*)

153.   Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

154.   The Defendants violated Mr. Barrier's rights under the RA through the facts described above.

155.   The Defendants are recipients of federal, state, and local financial assistance under Section 504 of the RA, 29 U.S.C. § 794.

156.   The Defendant Officers and THE TOWN AND CITY OF STAMFORD, CONNECTICUT violated Mr. Barrier's rights under the RA by not providing adequate accommodations or psychiatric care, considering the psychiatric urgent care facilities that the Officers and dispatchers instructed Mr. Barrier's mother to call closed before 6:30 pm.

157.   The City's policies and customs of treating mental health calls identical to criminal response calls, such as those not involving people with mental disabilities, violated Mr. Barrier's civil rights under the RA.

158.    The Defendants violated Mr. Barrier's rights when they failed to follow Connecticut CIT training, which amplified Mr. Barrier's schizophrenic symptoms. The Officers directly contributed to Mr. Barrier's psychiatric condition by chasing him, being aggressive, and failing to deescalate the situation.

159.   The Defendants violated Mr. Barrier's civil rights under the RA by failing to adequately train Officers to make reasonable accommodations for persons suffering or perceived to be suffering from mental illness or disabilities when they are arrested or taken into custody. Even the

26

Defendants' Executive Summary review "found that the agency itself failed by not providing training at least annually as per the policy."

160.    The Defendants violated Mr. Barrier's civil rights by wrongfully arresting him because they were indifferent to, and failed to accommodate, his disability, wrongfully characterizing his conduct as criminal activity, amongst other things.

161.    The Defendant's violated Mr. Barrier's civil rights under the RA by failing to conduct a self-evaluation of its existing policies and procedures to ensure that they were RA compliant and that failure caused his injuries.

162.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

## SIXTH COUNT
### (Deprivation of Civil Rights Pursuant to Connecticut State Constitution)

163.    Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

164.    The Defendants' aforementioned actions violated Connecticut Constitutional law, including, but not limited to, Article I, §§ 8 and 20 of the Connecticut Constitution and Conn. Gen. Stat. § 7–465.

165.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

## SEVENTH COUNT
### (Wrongful Death – Conn. Gen. Stat. 52-555)

166.    Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

167.    This action is brought pursuant to Section 52-555 of the Connecticut General Statutes.

168.   On October 23, 2019, Steven Barrier, Jr. died. On January 27, 2021, Valerie Jaddo was appointed Administrator of the Estate of Steven Barrier, Jr. by the Stamford Probate Court, State of Connecticut, Court of Probate District No. 55 (Fox, *G.*)

169.   The details above demonstrate how the Defendants were negligent in failing to provide proper and adequate care and treatment to Mr. Barrier while he was under their custody and control.

170.   As a result of the aforementioned negligence, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

**EIGHTH COUNT**
**(Negligent Hiring, Training, Retention, and Supervision)**

171.   Plaintiff repeats and re-alleges each and every one of the preceding allegations contained in this Complaint.

172.   The details above demonstrate how the Defendants, STAMFORD POLICE DEPARTMENT, and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, were negligent in hiring, training, supervising, and retaining police officers who failed to meet their duty of care while Mr. Barrier was in their custody and control.

173.   As a result of the aforementioned negligence, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

**NINTH COUNT**
**(Negligent Infliction of Emotional Distress)**

174.   Plaintiff Ms. Jaddo repeats and re-alleges each and every one of the preceding allegations contained in this Complaint. As a result of the aforementioned negligence, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

175.    At all times relevant herein, plaintiff Ms. Jaddo lived with her son, Steven Barrier, and was closely related to him.

176.    At all times relevant herein, Plaintiff, Ms. Jaddo, had a contemporaneous sensory perception of the mistreatment and neglect of her son, Steven Barrier.

177.    At all times relevant herein, Plaintiff, Ms. Jaddo, arrived on the scene and witnessed her son's lifeless body soon after the incident and before substantial change had occurred.

178.    The defendants' conduct was the cause of the Plaintiff Ms. Jaddo's serious emotional distress severe enough to substantially impair her ability to cope with life's daily routine and demands.

179.    Additionally, the aforementioned violations of Mr. Barrier's rights and negligence resulted in his mother, Ms. Jaddo's, emotional distress, mental anguish, pain, and suffering.

180.    Thus, the Plaintiff Ms. Jaddo, as the Administrator of the Estate of Mr. Barrier and on her own behalf, now seeks relief.

**TENTH COUNT**
**(Declaratory and Injunctive Relief for Violations of the aforementioned Civil Rights)**

181.    The Plaintiffs repeat, re-allege, and incorporate by reference each of the preceding allegations in this Complaint set forth fully herein.

182.    The Co-Plaintiff CLRP brings this claim on behalf of the people it serves to rectify the acts and omissions alleged herein.

183.    CLRP also seeks injunctive relief to reduce the number of wrongful deaths and civil rights violations that can occur as a result of the Defendants' interactions with persons with psychiatric disabilities.

184.    CLRP is a non-profit organization dedicated to protecting the civil rights and improving the lives of low-income persons with psychiatric disabilities living in Connecticut.

185.    CLRP's mission includes protecting peoples' civil rights under the ADA, the RA, the state and federal constitution, and state statutes.   Therefore, CRLP dedicates a large portion of its funding to protecting these rights.

186.    All clients and prospective clients of CLRP qualify for protection under the ADA and the RA because they are "individuals with a disability." 42 U.S.C. § 12102 172. 29 U.S.C. 705(20); CLRP brings this motion for relief on their behalf.

187.    The Defendants' civil rights violations have forced CLRP to divert its limited resources to aid individuals whose disabilities are made worse by the Defendants' unlawful actions.

188.     The organization has diverted limited resources to counteract unlawful policies and practices of municipal law enforcement agencies by expending time and funding to provide training to the people. It serves to educate them about their civil rights to counteract possible civil rights violations.

189.     Furthermore, CLRP has diverted resources to support litigation to protect its clients against the actions that violate the individuals' civil rights.

190.    CLRP seeks injunctive relief because the Defendants' unlawful policies and conduct frustrate its mission to enforce and protect the civil rights of persons with psychiatric disabilities.

191.    CLRP provides legal services to the clients of the Franklin S. Dubois Center, including its Welcoming and Immediate Service Center, and its Mobile Crisis Services, upon request.

192.    CLRP seeks declaratory and injunctive relief on behalf of the people it serves to modernize policies and thereby avoid future unlawful acts and omissions that occurred herein. CLRP maintains that such injunctive relief will reduce unnecessary police altercations, avoid unreasonable detentions, and prevent use of excessive force to citizens suffering from mental health disabilities.

193.    Specifically, CLRP seeks declaratory and injunctive relief directing that the Defendants, STAMFORD POLICE DEPARTMENT and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, respond to incidents involving psychiatric emergencies by sending a community-led, non-police, mental health Community Team as primary responders. This community-based response team will approach people in mental health crises with care and connection, not coercion and control.  Stamford must create a true alternative to a law enforcement response that does not involve anyone who is capable of initiating a legal process that forces an individual into a system with which they do not wish to engage.

194.    Thus, CLRP seeks injunctive relief directing that THE TOWN AND CITY OF STAMFORD, CONNECTICUT provide monetary funding to support:

a.  A series of community meetings to be held approximately monthly to listen to historically marginalized community members about how they want the community to respond to someone in distress.

b.  The preparation of a report, within three months after the last community meeting, summarizing the major themes of those meetings.

c.  The establishment of an organization, managed by people with first-hand lived experience of emotional distress/psychiatric disability, operating 24/7, providing confidential, individualized, non-medical support to people in crisis.

d.  Services shall be provided in a manner that respects the dignity and autonomy of all program participants.

e.  The City of Stamford shall provide the organization sufficient funding to lease or own a physically accessible space centrally located within Stamford, readily reachable by public transit (bus, train, etc.) where people can seek respite and maintain appropriate social

distancing. Alternatively, the City of Stamford can provide accessible space in a city-owned building as in-kind support. It must be a physically accessible space and does not require visitors to interact with a security guard employed or contracted by the City of Stamford.

f.  In addition, the Plaintiff seeks declaratory and injunctive relief directing that the Defendants STAMFORD POLICE DEPARTMENT, THE TOWN AND CITY OF STAMFORD, CONNECTICUT, immediately (a)  provide necessary funds to create and maintain a community-based  mutual aid, peer-led system that responds 24-7 to individuals in Stamford with a mental health condition who would otherwise be vulnerable to mistreatment and arrest, with care and connection, not coercion and control; (b) mandate Officers to stop wrongfully arresting mentally disabled individuals for nonlethal actions that directly result from their mental health disability and in first responding dispatch the community-based response team in applicable situations; and (c) appoint a Special Master at the Defendants' cost to chair a committee to evaluate, oversee, manage, advise, and direct the above ameliorative action for Stamford residents with mental health conditions who are vulnerable to mistreatment arrest.

g.  Services shall be provided in a non-discriminatory, non-coercive manner. No person shall be required to accept a particular form of treatment or follow a particular pathway of recovery to receive services.

h.  All staff shall be trained in crisis intervention, suicide intervention, and harm reduction, and shall do so from a trauma-informed orientation.

i.  The community-based mutual aid, peer-led organization shall report to the City of Stamford every quarter regarding the number of individuals to whom services were provided. No

details regarding the provision of services to any individual shall be shared without the express written permission of the person to whom services were provided.

j.   The establishment of this organization and ongoing funding shall be the baseline of the City's response and shall be the top priority of its response. Any other proposed solutions—e.g., more training of law enforcement, embedding social workers in police departments—shall not relieve the City of Stamford of the obligation to provide ongoing funding to establish and support a community response organization's continuing operation as outlined here.

### PLAINTIFF'S RIGHT TO PUNITIVE DAMAGES

195.   The egregious circumstances surrounding the Defendants' treatment leading directly to the death of Mr. Barrier while he was detained and in Defendants' custody justify punitive damages.

196.   The recovery of punitive damages is permitted pursuant to 42 U.S.C. Section 1983 for conduct showing a callous and reckless disregard for the constitutional rights of the plaintiffs.

### JURY DEMAND

Plaintiffs demand a trial by jury as to all counts for which jury trial is available by law.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment be entered in his favor and against the Defendants awarding:

a.   Compensatory damages for personal injuries, conscious pain and suffering, loss of enjoyment of life, and economic damages, both general and special, medical, hospital, and related costs, and future lost wages and/or income;

b.   Punitive damages;

c.   Interest;

d.   Costs, expenses, and attorney's fees incurred in this civil litigation; and

e.      Preliminary and permanent injunctions the Court deems necessary to rectify the

acts and omissions alleged herein, together with such other and further relief at law or in equity

that this Court deems just and proper.


Dated:        New York, New York
              March 16, 2021
                                        Respectfully submitted,




                            By: _____
                            Alan Fuchsberg, Esq. (CT Bar #31060)
                            Maya Pendergrass, Paralegal
                            THE JACOB D. FUCHSBERG LAW FIRM, LLP
                            3 Park Avenue, 37th Floor
                            New York, NY 10016
                            (212) 869-3500
                            *Attorney for Plaintiffs*




                            By: _____
                            Kelly Fitzpatrick, Esq. (CT Bar #29764)
                            FITZPATRICK LAW, LLC
                            33 Bullet Hill Road, Suite 301B
                            Southbury, CT 06488
                            Phone: (203) 516-8990
                            Fax:    (203) 437-7300
                            Email: kelly@fitzpatricklawgroup.com
                            *Attorney for Plaintiffs*


34