Jaehyun Oh
Alan L. Fuchsberg
THE JACOB D. FUCHSBERG LAW FIRM, LLP
3 Park Avenue, 37th Floor
New York, NY 10016
(212) 869-3500, Ext. 245
J.Oh@Fuchsberg.com

Kelly A. Fitzpatrick
KOSSKOFF KOSKOFF & BIEDER, PC
350 Fairfield Avenue
Bridgeport, CT 06604
(203) 336-4421
KFitzpatrick@Koskoff.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| VALERIE JADDO, Individually and as Administrator of the Estate of STEVEN BARRIER Jr., Deceased, on behalf of the Estate and Next of Kin, and the CONNECTICUT LEGAL RIGHTS PROJECT, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, LIEUTENANT DOUGLAS R. DIESO, and THE TOWN AND CITY OF STAMFORD, CONNECTICUT, <br><br> Defendants. | Civil Action No.: 3:21-cv-00350 (OAW) <br><br> **SECOND AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY AND PRAYER FOR INJUNCTIVE RELIEF** |

Valerie Jaddo ("Ms. Jaddo"), individually and on behalf of the estate and surviving distributees of her deceased son Steven Barrier, Jr. ("Mr. Barrier"), and Connecticut Legal Rights Project, Inc. ("CLRP"), by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Kosskoff Kosskoff & Bieder, PC, state and allege upon information and belief as follows:

## PRELIMINARY STATEMENT

1.     This action arises out of incidents that took Mr. Barrier's life on October 23, 2019, which serve as a prime example of Defendants' routine and systemic mistreatment of individuals with mental disabilities.

2.     Mr. Barrier had psychiatric disabilities including, but not limited to, schizophrenia and bipolar disorder, which were known to Defendants, by and through Stamford employed police officers from their prior interactions with Mr. Barrier and his mother, Ms. Jaddo, on previous dates and significantly, from even earlier that same evening. Indeed, when "Defendant police officers" (hereinafter defined so as to include both individually named Defendants and any and all other employed police officers of the Defendant Town and City of Stamford, Connecticut, who were participating in the specific actions and events described at the time)  responded to the first call on the subject night, which was regarding a domestic dispute Mr. Barrier was having with his mother and sister on October 22, 2019, Defendant Sergeant Michael Connelly, as well as other Defendant police officers, were told by Ms. Jaddo that her son was having a mental health crisis and required medical care. Yet, instead of treating him as an individual with a recognized serious mental health disability, Defendant police officers set up a non-mental health, non-medical plan to pursue and arrest Mr. Barrier when he returned home that night. Thus when Mr. Barrier returned home, Defendant police officers chased him until they caught up with him sitting collapsed and fatigued on a hillside, out of breath saying he could not stand up. Still, notwithstanding that they knew he was having a mental health crisis and that he was complaining that he was too exhausted to move, they refused to provide him with medical assistance but instead caused him to undergo additional exertion.

3.     Defendant police officers knew that Mr. Barrier was having a mental health crisis;

yet they failed to mitigate the risk of Mr. Barrier's condition by calling for medical or clinical services. Defendants and Defendant police officers failed to fulfill their ministerial duties to take Mr. Barrier to a mental health clinician or seek emergency medical services ("EMS"), as Mr. Barrier's mother specifically requested an hour and forty minutes before when the police came to the home for the second time to arrest Mr. Barrier. Defendants also failed to follow good and accepted police protocols and other mandatory directives applicable to the circumstances.

4.     During the arrest process, when Mr. Barrier expressed his inability to breathe, Defendants and Defendant police officers intentionally, with wanton and reckless disregard, and negligently disregarded Mr. Barrier's need for urgent medical care during the critical period—in which they could have saved his life—by failing to call mental health clinician services, by failing and delaying to call for EMS, by further and fatally stressing him by "drag[ing] his ass" down a hill in a prone position with his hands cuffed behind his back, by allowing his face to drag through puddles of water when Mr. Barrier was suffering extreme fatigue and required emergency medical attention, by refusing to take him to the hospital, and by failing to render Cardiopulmonary Resuscitation ("CPR") when he stopped breathing on account of their described conduct.

5.     Defendants and Defendant police officers violated Mr. Barrier's rights under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 by using unreasonable and excessive force in arresting and detaining Mr. Barrier. In addition, Defendants violated Mr. Barrier's rights under the Fourteenth Amendment to the U.S. Constitution by recklessly disregarding Mr. Barrier's need for emergency psychiatric and medical care and treatment. Defendants' violation of Mr. Barrier's civil rights resulted in Mr. Barrier suffering extraordinary conscious pain and suffering, culminating in his wrongful death in the morning of October 23, 2019, which was Mr. Barrier's 23rd birthday.

6. Defendant police officers acted with a culpable state of mind and intentionally violated relevant mandatory protocols including, but not limited to, those taught at Crisis Intervention Training ("CIT") by acting aggressively toward, chasing, dragging, taunting, and belittling Mr. Barrier, which fatally worsened his condition.

7. Because of the Stamford Police Department's gross and reckless conduct, when the EMS paramedics finally arrived at the police precinct, Mr. Barrier was not breathing, and his heart had stopped beating. He had been kept that way without CPR.

8. Defendants' and Defendant police officers' conduct in allowing Mr. Barrier to die was so egregious that their acts cannot be regarded as legitimate exercise of judgment or discretion. Rather, they committed ministerial acts in violation of prescribed statutes, legal authority, established procedures and instructions, even though they knew that such violations caused an imminent risk of substantial harm to Mr. Barrier's life and health.

9. Upon information and belief, Defendants have a systemic pattern of non-compliance with CIT, failing to provide reasonable accommodations to persons with known or perceived mental health disabilities, needlessly and recklessly escalating situations involving individuals requiring mental health services, using excessive force in such situations, and acting with deliberate indifference in refusing to provide urgent medical or psychiatric care. This pattern of behavior is particularly salient when Defendants respond to people of color having a mental health crisis.

10. Defendant THE TOWN AND CITY OF STAMFORD, CONNECTICUT ("Defendant City") violated Conn. Gen. Stat. Ann. § 7-294r by failing to train its police officers on how to reasonably accommodate mentally ill individuals during arrests as all police officers were not certified in CIT. *See* **Exhibit A** (The Executive Summary of Stamford Police

Department's "In Custody Death" Incident Review).

11.     The current CIT training by Defendant City does not adequately accommodate individuals with mental health disabilities as required under 28 C.F.R. § 35.130(b)(7) and Conn. Gen. Stat. Ann. § 7-294r.

12.     The Executive Summary of the "In Custody Death" Incident Review conducted by the Stamford Police Department dated July 7, 2020 (*i.e.*, **Exhibit A**) listed several recommendations that demonstrate the Defendants' actual failures in meeting necessary standards during Mr. Barrier's arrest, including: (1) "That individuals taken into custody [need to] be medically evaluated prior to transporting to jail after some type of strenuous activity (foot pursuit) or stressful event"; (2) "Mental Health assistance should be provided early on in an incident…;" (3) Stamford Police should have a person dedicated for mental health who would assist police officers and have a long-standing relationship with the Community Care Team; (4) All police officers should be certified in CIT; (5) All police officers should be certified in Cardiopulmonary Resuscitation ("CPR") and Emergency Medical Response ("EMR"); (6) "An Automatic External Defibrillator ("AED") [should] be placed at or near the Jail area"; (7) that "not all police officers had [their body cameras] activated when they should have"; (8) and that "…the agency itself failed by not providing [body camera] training 'at least annually' as per the policy."

13.     The Executive Summary specifically states that Defendant police officers violated mandatory regulations and protocols by turning off or never turning on their body cameras while Mr. Barrier died in their custody. These ministerial acts contributed to Mr. Barrier's wrongful arrest, inhumane treatment, and death.

14.     Defendants also violated Mr. Barrier's rights under the Fourteenth Amendment by

having a systemic pattern of applying the laws in an intentionally discriminatory manner when acting as first-responders to individuals of color having a psychiatric health crisis.

15.     Upon information and belief, Defendant City violated Conn. Gen. Stat. Ann. § 7-294s by failing to provide adequate training to its police officers in the use of physical force, body-worn recording equipment, and cultural competency and sensitivity training including but not limited to bias-free policing training and implicit bias training.

16.     Defendants' discriminatory application of the laws and violations of Conn. Gen. Stat. Ann. § 7-294r and Conn. Gen. Stat. Ann. § 7-294s has caused the death or irreparable harm to a disproportionate number of people of color with psychiatric disabilities, including the deceased Mr. Barrier.

17.     The case of Mr. Barrier conflates both the discrimination on account of his psychiatric disability and on account of his race.

18.     Upon information and belief, when the Stamford Police Department responds to white persons in a mental health crisis, they more often follow CIT protocol, thereby acknowledging that these persons are suffering from a medical condition and are not criminals.

19.     Defendant City failed to or improperly trained its agents, servants, employees, and police officers on how to recognize and mitigate unconscious biases against a particular segment of the population—namely Black persons with mental health disabilities. Such failure influenced Defendant police officers' judgments and decisions when interacting with a member of such segment of the population, which resulted in Mr. Barrier's premature death.

20.     Defendant City violated Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("RA"), and protocols mandated by the Department of Justice under 28 C.F.R. § 35.130(b)(7) by failing to make reasonable modifications in its policies,

practices, or procedures to avoid discrimination based on psychiatric disability during arrest and police investigations.

21.     Defendants violated Mr. Barrier's rights under ADA, RA, Connecticut Constitution, and Conn. Gen. Stat. § 7–465, because they failed to reasonably accommodate Mr. Barrier's mental health disability, wrongfully arrested him for displaying schizophrenic symptoms, and caused him to suffer unnecessary injury and indignity on account of their unlawful conduct.

22.     Defendants' actions and omissions were the direct and proximate cause of Mr. Barrier's permanent and catastrophic injuries for which Plaintiff Ms. Jaddo, as the Administrator of the Estate of Mr. Barrier and on her own behalf, now seeks relief including compensatory, exemplary, and punitive monetary damages.

23.     Co-Plaintiff CLRP is a non-profit legal services organization whose goal is to protect civil rights of mentally disabled Connecticut residents. CLRP's missions and projects have been, and continue to be, impeded by Defendants' systemic unlawful practices toward CLRP's clientele.

24.     CLRP must divert significant resources to counteract Defendants' unconstitutional and unlawful practices against individuals with mental health disabilities during police interactions, which result in grave injuries and/or wrongful death to such individuals as seen in the tragic case of Mr. Barrier.

25.     Therefore, CLRP joins this action to redress impending harm to its activities caused by Defendants' future unlawful acts and omissions in their treatment of Stamford residents with mental disabilities.

26.     CLRP seeks declaratory and injunctive relief, directing the Defendant THE TOWN AND CITY OF STAMFORD, CONNECTICUT to respond to incidents involving psychiatric

emergencies by sending a community-led, non-police mental health response team as primary responders that meet the requirements as will be detailed below. CLRP maintains that such injunctive relief will reduce unnecessary police interactions, avoid unreasonable detentions, and prevent or reduce the use of excessive force toward people with mental health disabilities.

27.    Specifically, CLRP seeks declaratory and injunctive relief directing that, the Defendant THE TOWN AND CITY OF STAMFORD, CONNECTICUT and/or Stamford Police Department to immediately (a) provide necessary monetary funds to support the creation of a community-based team that responds to mental health crisis from a place of care and connection, not coercion and control; (b) mandate police officers to stop wrongfully arresting mentally disabled individuals for nonlethal actions that directly result from their mental disability and instead dispatch a community-led mental health response team as primary responders in applicable situations; (c) provide residents access to urgent psychiatric services that remains available for twenty-four hours a day and seven days a week for individuals who are seeking urgent psychiatric care; and (d) appoint a Special Master at the Defendants' cost to chair a committee to evaluate, oversee, manage, advise, and direct ameliorative action for mentally disabled residents of the City of Stamford to prevent future mistreatment and unlawful arrests by Defendants.

## PARTIES

28.    Mr. Barrier, Plaintiff Ms. Jaddo's deceased son, was a citizen of the State of Connecticut and was in the custody of the Stamford Police Department, a municipal department of the Defendant THE TOWN AND CITY OF STAMFORD, CONNECTICUT, from October 22, 2019, to his death on October 23, 2019. Under Conn. Gen. Stat. § 52-555 and other governing laws, Plaintiff Ms. Jaddo, as the Administrator of the Estate of Mr. Barrier, seeks compensatory and punitive damages for the wrongful death, permanent injuries, and conscious pain and suffering

of Mr. Barrier. In addition, Plaintiff Ms. Jaddo individually seeks to recover economic and non-economic damages for the wrongful death of Mr. Barrier.

29.     Co-Plaintiff CLRP is a non-profit legal services organization dedicated to protecting civil rights and improving the lives of low-income persons with psychiatric disabilities living in Connecticut, including Stamford, Connecticut. CLRP's mission is to provide high quality advocacy to persons with psychiatric disabilities related to the treatment they receive by reason of their disabilities.

30.     Defendants' routine practice of mistreating individuals with mental health disabilities while in police custody has placed CLRP's clients at a grave risk for serious bodily injury, wrongful death, and unlawful arrest. Defendants' unconstitutional and otherwise unlawful practice of criminalizing mental disability has forced and continues to force CLRP to divert its limited resources, including staff time, toward lobbying efforts and counseling/referral services for arrestees with mental disabilities, for the purpose of counteracting the Defendant's unlawful actions.

31.     CLRP has organizational standing to seek injunctive relief in its own rights because Defendants' unlawful actions directly injure CLRP. CLRP seeks to challenge Defendant City's policy of criminalizing and mistreating mentally ill arrestees or detainees, as 'such policy frustrates CLRP's goals, projects, and mission to protect the civil rights of persons with psychiatric disabilities. CLRP has had to divert significant organizational resources and funds to counteract the Defendant's unlawful actions, when such resources and funds could have been spent on other activities including, but not limited to, providing legal assistance to clients in non-custodial context.

32.     Defendant THE TOWN AND CITY OF STAMFORD, CONNECTICUT is a

municipal government entity that manages the Stamford Police Department, and its agents, servants, and employees, including, but not limited to, individually named Defendant police officers.

33.     The Stamford Police Department is located at 725 Bedford St., Stamford, Connecticut 06901. It operates under the control, guidance, policy, regulations, and supervision of Defendant, THE TOWN AND CITY OF STAMFORD, CONNECTICUT. Thus, Defendant City is vicariously liable for all the acts and omissions of the Stamford Police Department and its agents, servants, and employees. Upon information and belief, Defendant City receives federal financial assistance in funding the activities of Stamford Police Department.

34.     At all relevant times, Defendant SERGEANT MICHAEL CONNELLY was and is a Sergeant employed by the Stamford Police Department and Defendant City. In his role and capacity as an agent, servant, and/or employee of the Stamford Police Department, SERGEANT MICHAEL CONNELLY oversaw the custody of Mr. Barrier and his arrest. SERGEANT MICHAEL CONNELLY is sued in his individual and official capacities.

35.     At all relevant times, Defendant, OFFICER RHETT CONNELLY was and is an Officer employed by, the Stamford Police Department and Defendant City. In his role and capacity as an agent, servant, and/or employee of Stamford Police Department, OFFICER RHETT CONNELLY actively participated in the custody of Mr. Barrier and his arrest. OFFICER RHETT CONNELLY is sued in his individual and official capacities.

36.     At all relevant times, Defendant OFFICER TROY C. JUDGE was and is an Officer employed by the Stamford Police Department and Defendant City. In his role and capacity as an agent, servant, and/or employee of Stamford Police Department, OFFICER TROY C. JUDGE actively participated in the custody of Mr. Barrier and his arrest. OFFICER TROY C. JUDGE is

sued in his individual and official capacities.

37.     At all relevant times, Defendant LIEUTENANT DOUGLAS R. DIESO was and is a Lieutenant employed by the Stamford Police Department and Defendant City. In his role and capacity as an agent, servant, and/or employee of Stamford Police Department, LIEUTENANT DOUGLAS R. DIESO approved the custody of Mr. Barrier and his arrest. LIEUTENANT DOUGLAS R. DIESO is sued in his individual and official capacities.

38.     Defendants SERGEANT MICHAEL CONNELLY, OFFICER RHETT CONNELLY, OFFICER TROY C. JUDGE, and LIEUTENANT DOUGLAS R. DIESO are collectively referred to as "Defendant Officers," and collectively with other police officers involved in the subject incident, as "Defendant police officers."

39.     Upon information and belief, at all relevant times, the Defendant police officers were employed by, and acting in the line of duty at the direction of and on behalf of, Defendant City.

## JURISDICTION

40.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331, as raising a federal question under the United States Constitution and Acts of Congress.

41.     The Court has supplemental jurisdiction over all other Connecticut state law claims pursuant to 28 U.S.C. § 1367, as they are related to and constitute part of the same case or controversy.

## VENUE

42.     Venue is proper in this District under 28 U.S.C. § 1391(b) as the parties reside in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

43.     Mr. Barrier was born and raised in Stamford, Connecticut. As a member of the community, Mr. Barrier was known as a kind-hearted person by his family, co-workers, and friends. Many members of his community were distraught after he died in Defendants' custody.

44.     Mr. Barrier qualified as a disabled person entitled to protection under Title II of the ADA and Section 504 of the RA as he was diagnosed with schizophrenia, bipolar disorder, and other psychiatric disorders.

45.     Mr. Barrier started experiencing schizophrenic symptoms at the age of 15. As a 22-year-old, Mr. Barrier worked at a local restaurant and attended school.

46.     Upon information and belief, on previous occasions, Mr. Barrier's mother, Ms. Jaddo, called 911 to request urgent psychiatric care for him. However, Stamford police did not send a psychiatric crisis management team or take Mr. Barrier to a psychiatric hospital. Instead, Defendants continued to arrest Mr. Barrier.

47.     On numerous occasions, Defendants told Ms. Jaddo to stop calling 911 and to instead call the mental health crisis hotline, CT Renaissance, or F.S. Dubois urgent mental health centers. The Police Department and 911 dispatchers knew or should have known that these recommended centers all close before 6:30 pm.

48.     When Ms. Jaddo followed the Defendants' instructions and called the crisis hotline number to get Mr. Barrier urgent care after 6:30 pm, the hotline instructed her through an automated message to hang up and call 911 immediately.

49.     Yet, when Ms. Jaddo contacted 911 in these circumstances, Defendants again berated Ms. Jaddo for calling 911. Defendants knew or should have known that they were the only channel through which Ms. Jaddo and Mr. Barrier could obtain emergent psychiatric services after

6:30 pm.

50.     Before the incident at issue and including up to three days before the incident, Ms. Jaddo filed several written and verbal complaints with Defendants and requested that the Stamford police officers stop arresting Mr. Barrier. Ms. Jaddo requested that Defendants instead send an ambulance and/or a psychiatric crisis management team as Mr. Barrier needed medical care.

51.     Like many individuals living with a psychiatric disability, Mr. Barrier often needed urgent care after the normal operating hours for the community mental health clinics. Nevertheless, Defendant City failed and continues to fail to provide adequate emergency mental health services after 6:30 pm, which puts the lives of Mr. Barrier and other residents of Stamford at risk.

52.     The lack of adequate emergency mental health services at Stamford compelled Ms. Jaddo to call 911, resulting in Mr. Barrier's encounters with police on multiple occasions, including on the night of the incident—October 22, 2019.

53.     Upon information and belief, Defendants had a statistical pattern of recklessly or intentionally harming individuals of color living with psychiatric disabilities. Specifically, when Defendants face white citizens in a mental health crisis, Defendants are significantly less likely to act toward such white citizens in a physically abusive or violent manner, with deliberate indifference to their health and safety, or in violation of mental health crisis protocols.

54.     For example, three white citizens (referred to as "John Doe 1", "Jane Doe 1", and "Jane Doe 2"), whose names will remain concealed for privacy reasons, described being treated less aggressively by the Stamford Police than Mr. Barrier and other non-white individuals in similar positions. These individuals corroborated that the Stamford police followed proper CIT protocols when interacting with white citizens.

55.     Specifically, the police responded less violently when John Doe 1 and/or his mother, referred to as Jane Doe 1, had many mental health crises. John Doe 1 and Jane Doe 1 have had multiple interactions with Stamford Police because John Doe 1 has a chronic substance use disorder, and Jane Doe 1 was diagnosed with schizophrenia.

56.     On multiple occasions, Defendants responded less violently to domestic disputes involving John Doe 1 and/or Jane Doe 1. Defendants did not arrest these individuals even when they acted unlawfully.

57.     In one incident, the police responded to a domestic dispute at their home. When the police arrived, Jane Doe 1 violently fought and kicked the police, but the police did not use excessive force. In this incident, the police followed the CIT techniques to deescalate the situation, including backing up, giving her personal space, speaking softly, and transporting her to a hospital (rather than police precinct or jail) for urgent psychiatric care. Moreover, John Doe 1 acknowledged that while his mother was fighting the police, he became upset and went into the adjacent room and began smoking marijuana. John Doe 1 stated that the police were aware or should have been aware that John Doe 1 was smoking marijuana—which was an illegal drug at the time—because the smell of the marijuana was permeating into the room the police were in. However, the police did not arrest or address John Doe 1 during this time.

58.     Moreover, John Doe 1 stated that the police responded to his drug use multiple times in a non-violent manner.

59.     Another Stamford resident Jane Doe 2 stated that the police told a white individual having a mental health crisis that they wanted to help them and immediately contacted urgent psychiatric care.

60.     In contrast, when Ms. Jaddo called 911 to get emergency psychiatric care for

Mr. Barrier, a Black male, the Defendant police officers arrived at her home with their guns drawn andpointed at Ms. Jaddo and Mr. Barrier.

61.     Although Mr. Barrier was never armed, Defendants continued this pattern whenever his mother called for urgent psychiatric assistance.

62.     The night of the incident, October 22, 2019, Mr. Barrier went to work and returned home before 11 pm.

63.     Mr. Barrier began to resist his mother and started pointing a broom in her direction in protest to taking his psychiatric medication. At this point, Mr. Barrier had heightened paranoia, memory loss, hallucinations, mental confusion, delusions, and psychosis, and he needed urgent medical assistance.

64.     Mr. Barrier's sister called 911 at 11:40 pm regarding the domestic dispute.

65.     The sister told the dispatcher that Mr. Barrier did not have any deadly weapons.

66.     At this night hour, all the crisis mental health hotlines and the mental health centers were closed. Thus, Ms. Jaddo had to rely upon Defendants to provide emergency assistance and psychiatric care for Mr. Barrier.

67.     At 11:45 pm, police officers from the Stamford Police Department, including Defendant SERGEANT MICHAEL CONNELLY arrived at the family home. As soon as the police officers arrived, Ms. Jaddo stepped out of the home and told the Defendant police officers that Mr. Barrier was having a psychiatric episode and needed help.

68.     By the time the police arrived, Mr. Barrier had left the premises.

69.     Ms. Jaddo told the Defendant police officers that Mr. Barrier and his sister had briefly wrestled with each other. Mr. Barrier's sister confirmed to the police that she was not hurt and did not need a paramedic.

70.     Ms. Jaddo told the Defendant police officers that Mr. Barrier's schizophrenic symptoms had recently increased and that he was having a mental health crisis.

71.     Defendant police officers disregarded Ms. Jaddo's comments and asked her where Mr. Barrier was.

72.     Some of Defendant police officers entered the home while the other police officers canvased the surrounding area. The police officers remained in the home from approximately 11:44 pm to 12:38 am.

73.     They listened to Ms. Jaddo explain multiple times that she needed Defendant police officers to take her son to a hospital, as opposed to arresting him, because he was having a mental health crisis.

74.     While the police officers were in the home, Ms. Jaddo told them that Mr. Barrier often had these outbursts due to his psychiatric condition, and then would wander for a while before calming down and returning home.

75.     Once Defendant police officers finished canvassing the home, they decided they would return to arrest Mr. Barrier and instructed Mr. Barrier's sister to text the police officers when Mr. Barrier returned.

76.     After Defendant police officers left, Mr. Barrier called his mother to apologize on the phone and then returned to his home.

77.     At 1:24 am, his sister followed the police officers' instructions and texted the police officers that Mr. Barrier had returned home.

78.     The police officers returned to the home to arrest Mr. Barrier at 1:28 am—approximately one hour and forty minutes after Ms. Jaddo had initially told Defendant police officers that her son was in a psychiatric crisis and needed urgent medical care.

79.     Although Defendant police officers were on notice that Mr. Barrier needed urgent psychiatric care, they refused and failed to provide required care for Mr. Barrier during the ample time they had to do so. Defendant police officers did not fill out the appropriate paperwork under Conn. Gen. Stat. § 17a-503 known as Police Emergency Evaluation Request, did not consult with a clinician and/or EMS, and did not transport Mr. Barrier to a hospital for an emergency mental health evaluation.

80.     Nor did Defendant police officers return with or deploy any mental health clinician services, even though they knew it was necessary and was specifically requested by Ms. Jaddo on multiple occasions in the past including earlier the same night.

81.     When Defendant police officers returned to the home to arrest Mr. Barrier, they refused to follow proper directives including CIT protocols. For example, Defendant Police officers improperly escalated the situation by worsening Mr. Barrier's psychiatric condition through, *inter alia*, chasing him down, screaming "Come here, Barrier!", not attempting to defuse the situation, wrongfully arresting him, refusing to engage him in conversation to calm him, using offensive and harsh language, not giving him space by backing away, ignoring Ms. Jaddo's requests for medical assistance for Mr. Barrier, refusing to call EMS, and taking Mr. Barrier to the police precinct rather than a hospital to put him in a jail cell.

82.     If Defendant police officers had followed the proper protocols by providing Mr. Barrier with medical help instead of wrongfully arresting him, Mr. Barrier would still be alive today.

83.     Defendant police officers proceeded to chase Mr. Barrier outside of the home to a steep hill. When the Police officers found Mr. Barrier in a semi-conscious state at the top of the hill, instead of ensuring his safety and health, Defendants SERGEANT MICHAEL CONNELLY,

OFFICER RHETT CONNELLY, and OFFICER TROY C. JUDGE handcuffed Mr. Barrier's hands behind his back.

84.     Defendants acted with gross, deliberate indifference by refusing to call a paramedic after knowing Mr. Barrier had a medical emergency on the hill, which was later described as a "syncopal episode."

85.     The EMS agent who eventually responded to the police precinct wrote:

"Spd [Stamford Police Department] stated they were in foot pursuit of the pt [patient] Mr. Barrier] when they finally caught him in the woods, and pt appeared to be winded and had a syncopal episode. Pt was moved to the Officer car, were pt started thrashing violently, and upon arrival at Headquarters pt became unconscious."

86.     Stamford Police Department released some of the police body camera footages to the public on their online webpage. Video recordings of the events described herein can be viewed at   the   following   URL   location:   https://www.stamfordct.gov/government/boards-commissions/police-commission/steven-barrier-timeline, all of which  are  hereby  incorporated as  part  of this Complaint.

87.     The video footages show the Defendant police officers yelling at Mr. Barrier and callously demanding that he get up. Mr. Barrier's hands are still cuffed behind his back—which would make it difficult for even a healthy person to pick themselves up on a wet, slippery hill. Defendant Police officers continuously screamed "get up" at Mr. Barrier, although Mr. Barrier told them at least four times that he could not get up and once that he was too tired.

88.     The video footages show Mr. Barrier panting and struggling to breathe. Since each police officer cannot be identified by name in the police body camera footages, the Defendant police officers are referred to as "Officer A," "Officer B," and "Officer C" in the conversations quoted below. While arresting Mr. Barrier at the top of the hill, as seen in the video footage, Defendant police officers stated the following:

Police officers A: "Stand up, stand up!"
Mr. Barrier: "I can't."
Officer A: "Why can't you walk?"
Officer A: "Get up! Come on, come on, get up!"
Mr. Barrier is heard panting and says: "I can't" (inaudible but it appears that Mr. Barrier attempts to say, "can you help me please?"
Officer A: "Get up, get up, man!"
Mr. Barrier: "I can't. I'm so tired. I can't!"
Officer A: "You want to run? Let's run, come on, come on!"
Unknown Officer: "Let's just drag him."
Officer A: "Are you f****** kidding me!"
Officer B: *uses his walkie talkie to contact the other Police officers nearby and tells them* "There is no pointing of you coming up here. You are just going to get filled with mud like we are. We're going to drag him down."
Officer A: "F*** you" or "F*** Dude" to Mr. Barrier.

89.    After this, Mr. Barrier remained silent, immobile, and slumped on the ground.

90.    As confirmed by the State's subsequent investigation, Mr. Barrier did not resist arrest or act aggressively toward the Police officers.

91.    As Mr. Barrier was unable to pick himself up, Defendant police officers then proceeded to forcibly drag him down the hill, still in handcuffs. Defendant police officers knew that Mr. Barrier needed urgent medical help as shown by the fact that they repeatedly stopped in their tracks to check if Mr. Barrier was still alive.

92.    As Defendant police officers indifferently and violently dragged Mr. Barrier down the hill, the police officers knew that Mr. Barrier could die. Still, they continued to allow his face to drag through the wet grass, stating:

Officer A: "Is he breathing."
Officer B: "Hold on. Let me check him."

93.    At this point, Defendant police officers stopped dragging Mr. Barrier, and they dropped Mr. Barrier back onto the ground. In the video footage, the police officers say:

OFFICER RHETT CONNELLY: "Put him down" (Police officers chuckle.)
Officer B: "Let me make sure. Yeah, he's still with us."
SERGEANT MICHAEL CONNELLY: "But don't put his face in the water. Keep him out

of the water." (Police officers chuckle.)
Officer C: "He picked the wrong crew."

94.     Although Mr. Barrier was dying at this time, one officer callously suggested that they roll Mr. Barrier's body down the hill rather than dragging him, sarcastically stating: "We could roll him."

95.     Defendant police officers arrived at the bottom of the hill where it meets with the Home Depot parking lot. Although Mr. Barrier was in a critical condition, an Officer asks the other Police officers if they want a break.

96.     Defendant police officers then let Mr. Barrier lie limp on the ground in the parking lot at the bottom of the hill. His hands were still handcuffed behind his back.

97.     In the video footage, Mr. Barrier is seen lying on top of his handcuffed hands on the concrete, gasping for air and asking the police officers for help: "Help me, help me please, ughh ughh."

98.     But Defendant Officers never responded in any form to Mr. Barrier's pleas for help.

99.     Defendant police officers placed Mr. Barrier in the back of a police car while he moaned in pain.

100.    After Defendant police officers placed Mr. Barrier into the police car, an officer who is not a named Defendant asks if they should take Mr. Barrier to a hospital instead of the police precinct. He further says, "Oh, I thought we had to. I thought we had to." A Defendant Officer improperly responds, "No, he is psychotic. Nah, he's going to jail," while mockingly swirling his finger around his head.

101.    Thus, Defendants purposefully discriminated against Mr. Barrier by refusing to take him to a hospital to receive life-saving medical and psychiatric treatment when it was obvious that he urgently needed same. Defendants made a conscious and deliberate choice to arrest Mr.

Barrier and treat him like a criminal instead of providing him with medical assistance because Mr. Barrier was "psychotic." The quote above serves as a prime example of Defendant's conscious refusal to provide needed care to Mr. Barrier because of his mental disability and their dismissive attitude toward it. In other words, Mr. Barrier was denied life-saving medical treatment that could have prevented his premature death because he is "psychotic."

102.   Moreover, Defendant police officers repeatedly mocked and laughed at Mr. Barrier's condition even after it became apparent that Mr. Barrier was having grave difficulty breathing and needed urgent medical attention.

103.   In the police car, the transporting officer drove past a hospital to take Mr. Barrier to the police precinct even though, on the way, Mr. Barrier began to have a seizure. The transporting officer heard Mr. Barrier moaning in pain with increasing intensity, but the officer did not stop driving to check on Mr. Barrier.

104.   Defendant police officers could have easily taken Mr. Barrier to a hospital instead of the police precinct, which would have saved his life. In fact, a nearby hospital was a shorter distance away from the site of arrest than the police precinct was.

105.   When Defendant police officers and Mr. Barrier arrived at the police precinct, the Police officers ordered Mr. Barrier to get out of the police car, but Mr. Barrier could not because he was unconscious and slumped over in the back seat.

106.   Later, the Stamford Police Department acknowledged that "When taking him out of the cruiser at headquarters, Police officers found that Mr. Barrier had lost consciousness."

107.   After forcibly pulling Mr. Barrier out of the police car, Defendant police officers roughly placed him on the ground.

108.    After Defendant police officers carried Mr. Barrier's unconscious body into the booking area, they kept him handcuffed and laughed at his condition while Mr. Barrier took his last breaths on his 23rd birthday.

109.    During this time, an officer who is not a named Defendant says, "We could put him in a chair and take the handcuffs off." However, the Defendant Police officers ignored the suggestion and kept Mr. Barrier's hands handcuffed behind his back and left him, limp and unresponsive, shackled on the floor.

110.    The Executive Summary of the "In Custody Death" Incident Review conducted by the Stamford Police Department (*i.e.*, **Exhibit A**) described Defendant police officers' failures that led to Mr. Barrier's death as follows:

> While in the holding area, police officers were assessing the medical condition of Steven, but coming up with conflicting ways to potentially address it. There was a lack of consensus on what to do until medical first responders arrived. No one there immediately assumed command of the incident. One supervisor peered in but did not intervene further.

111.    While Mr. Barrier was in the holding cell, Defendant police officers performed a sternum rub to see if Mr. Barrier was responsive, but Mr. Barrier never responded. Moreover, Mr. Barrier's eyes had rolled to the back of his head by this time. Thus, Defendant police officers knew or should have known that he was unconscious and could not move. EMS was still not there.

112.    Three minutes after Defendant police officers performed the sternum rub and verbally acknowledged that Mr. Barrier was unresponsive, one Officer smiled and laughed while leaving the holding cell where Mr. Barrier's body was lying. This Officer then joked about Mr. Barrier's worsening condition and said, "We should prick his foot and see if we can get a reaction." Another Officer said, "Or slide a credit card under the nose that will make him jump."

113.    Another Officer standing in the holding cell around Mr. Barrier's body joked that the transporting officer's driving must have led to Mr. Barrier's unresponsiveness. The other Police

officers laughed, dismissing and mocking Mr. Barrier's serious medical condition.

114.    Another Officer believed to be a supervisory officer also mocked Mr. Barrier's seizure, saying that Mr. Barrier was "bouncing his ass" in the back of the police car.

115.    During this time, Defendant police officers continued to mock Mr. Barrier and did not attempt to perform basic first aid or CPR to save Mr. Barrier's life, although such procedures must be part of their basic training.

116.    Eventually, Defendant police officers contacted EMS. By the time EMS arrived, Mr. Barrier's heart was not beating, and he had stopped breathing.

117.    According to Fire Department Report, the paramedics reported that:

"M3 and ES crews entered the lockup to find the patient propped up sitting against a wall with handcuffs on behind his back. One officer asked should they be removed. The paramedic from M3 leaned in to notice that the patient was not breathing. He felt for a pulse to find none. Capt. Davis requested that the handcuffs be removed, and they were removed right away."

118.    Notably, according to the EMS notes, if Defendant police officers had called for a paramedic right away, Mr. Barrier could have survived:

"Unfortunately, given the prolonged down time, the chances of meaningful recovery at this point were negligible."

119.    Mr. Barrier was pronounced dead at Stamford Hospital on his 23rd birthday at 3:10 am.

120.    The autopsy details the blunt force injuries Mr. Barrier suffered, including, but not limited to, scattered abrasions of the head, torso, extremities, and wrist restraint marks.

121.    After Defendants caused Mr. Barrier's death, hundreds of people marched and protested at the Stamford Police Department, calling for justice.

122.    Defendant police officers acted under pretense and color of State law.

123.    Above-outlined acts by Defendants and their agents, servants, and employees were

beyond the scope of their jurisdiction, without the authority of law, and an abuse of their powers.

124.    Said acts by the Defendants were deliberately indifferent to Mr. Barrier's health and safety. Specifically, they were aware of, and callously ignored, Mr. Barrier's obvious need for urgent medical treatment and instead exerted excessive force on him in reckless disregard of his health and welfare.

125.    Furthermore, the Stamford Police Department, and Defendant City, under the color of State law, acting through individuals with final policymaking authority, pursued a policy, practice, or custom in their decision making that permitted repeated abuse of arrestees and detainees through deliberate indifference. Such abuse continues because of Defendants' failure to communicate adequately with medical providers during arrest process. This conduct caused Mr. Barrier to suffer catastrophic injuries, pain and suffering, and wrongful death.

126.    Defendant City, and its agents, servants, and employees including those with the Stamford Police Department were negligent in hiring, retaining, training, and supervising their employees. They were aware or should have been aware of their subordinates' practices and violations of detainees' rights. Yet, they condoned and permitted policies or customs under which unconstitutional practices occurred and enabled them to continue.

127.    These acts or omissions resulted in the deprivation of Mr. Barrier's federal and state constitutional and statutory rights, conscious pain and suffering, and his permanent and catastrophic injuries, including his untimely death.

128.    Defendants knew that the Mr. Barrier was in an imminent risk of serious and irreversible harm.

129.    Defendants knew that Mr. Barrier was an identifiable victim under great undue hardship and suffering who required emergent medical aid.

130.    It was apparent to the Defendants that the dangerous condition was so likely to cause Mr. Barrier imminent harm that they had a clear and unequivocal duty to act immediately to prevent the harm.

## FIRST COUNT
### (Deprivation of Civil Rights under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)
### (By Plaintiff Jaddo in her Representative Capacity As to all Defendants)

131.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

132.    Defendants violated Mr. Barrier's right under the Fourth Amendment to the U.S. Constitution and 42 U.S.C. § 1983 by using unreasonable and excessive force in detaining Mr. Barrier.

133.    All Defendant Police officers contributed to the aforesaid violations because they used unreasonable force, which caused and exacerbated Mr. Barrier's critical condition.

134.    As a result of the aforementioned violation, Mr. Barrier suffered conscious pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

135.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and economic injuries in an amount to be determined at trial.

136.    The egregious circumstances surrounding the Defendants' treatment leading directly to the death of Mr. Barrier while he was detained in Defendants' custody justify punitive damages.

137.    The recovery of punitive damages is permitted pursuant to Section 1983 for government defendants' conduct showing a callous and reckless disregard for the constitutional rights of plaintiff as here.

**SECOND COUNT**
**(Deprivation of Civil Rights under the Due Process Clause of the**
**Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983)**
**(By Plaintiff Jaddo in her Representative Capacity As to all Defendants)**

138.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

139.    Defendant Police officers violated Mr. Barrier's right under the Fourteenth Amendment to the U.S. Constitution by being deliberately indifferent and willfully disregarding Mr. Barrier's need for urgent medical and psychiatric attention.

140.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

141.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and economic injuries in an amount to be determined at trial.

142.    The egregious circumstances surrounding the Defendants' treatment leading directly to the death of Mr. Barrier while he was detained in Defendants' custody justify punitive damages.

143.    The recovery of punitive damages is permitted pursuant to Section 1983 for government defendants' conduct showing a callous and reckless disregard for the constitutional rights of plaintiff as here.

**THIRD COUNT**
**(Deprivation of Civil Rights under the Equal Protection Clause of the**
**Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983)**
**(By Plaintiff Jaddo in her Representative Capacity As to all Defendants)**

144.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

145.     Defendants violated Mr. Barrier's rights under the Fourteenth Amendment by having a statistical pattern of applying the laws in an intentionally discriminatory manner when acting as first-responders to individuals of color having psychiatric health crisis, compared to white individuals having same crisis.

146.     Moreover, upon information and belief, Defendants willfully violated Conn. Gen. Stat. Ann. § 7-294s by failing to provide their employees with adequate cultural competency and sensitivity and bias-free policing training, including, but not limited to, implicit bias training.

147.     Defendants failed to train or improperly trained its agents, servants, employees, and police officers on how to recognize and mitigate unconscious biases against a particular segment of the population—namely, Black individuals with mental health disabilities. This failure and lapse negatively influenced police officers' judgments and decisions when interacting with a member of such segment of the population, which resulted in Mr. Barrier's premature death.

148.     Defendants have a statistical pattern of failing to follow CIT training, failing to provide reasonable accommodations under the ADA, recklessly escalating situations, acting violently, acting with deliberate indifference by refusing to provide urgent psychiatric care when responding to people of color having a mental health crisis, and failing to implement the required training mandates under Conn. Gen. Stat. Ann. § 7-294s and 28 C.F.R. § 35.130(b)(7).

149.     In Mr. Barrier's and other cases, Defendants had a pattern of failing to send a Mental Health Crisis Team to Black citizens during mental health crises. They instead acted with deliberate indifference and excessive force, resulting in their deaths. In contrast, upon information and belief, the Stamford Police Department more frequently followed CIT training and other relevant policies in similar situations involving white citizens.

150.     Because the Stamford police refuse to abide by proper protocols in treating Black

citizens who require urgent psychiatric services as opposed to white citizens, a disproportionable number of police encounters with people of color experiencing mental health crises results in death or irreparable harm. For example: In the past year, Connecticut police killed two Black men diagnosed with schizophrenia by refusing to follow the aforementioned regulations.

151.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

152.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and economic injuries in an amount to be determined at trial.

153.    The egregious circumstances surrounding the Defendants' treatment leading directly to the death of Mr. Barrier while he was detained in Defendants' custody justify punitive damages.

154.    The recovery of punitive damages is permitted pursuant to Section 1983 for government defendants' conduct showing a callous and reckless disregard for the constitutional rights of plaintiff as here.

**FOURTH COUNT**
**(Deprivation of Civil Rights Pursuant to the ADA, 42 U.S.C. §§ 12101 *et seq.*)**
**(By Plaintiff Jaddo in her Representative Capacity**
**As to Defendant Town and City of Stamford, Connecticut)**

155.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

156.    Defendant Police officers, as agents, servants, and employees of Defendant City violated Mr. Barrier's rights under the ADA through the facts described above.

157.    Defendant Police officers purposefully discriminated against Mr. Barrier for his disability by refusing to take him to a hospital to receive live saving medical and psychiatric

treatment when it was obvious that he needed same.

158.     A Defendant Officer's statement, captured on video, where he told another officer to take Mr. Barrier to the precinct instead of a hospital because "he is psychotic. Nah, he's going to jail," is a prime example of Defendants' deprivation of needed services to Mr. Barrier because of his disability. In other words, Mr. Barrier was denied life-saving medical treatment that could have prevented his premature death for no other reason than that he is "psychotic." Defendants made a conscious and deliberate choice to arrest Mr. Barrier and treat him like a criminal instead of providing him with medical assistance because Mr. Barrier was "psychotic."

159.     Defendant City violated Mr. Barrier's rights under the ADA by failing to provide adequate reasonable accommodations including ready access to psychiatric services to citizens in mental health crises.

160.     Defendant City had a routine practice of letting police officers and 911 dispatchers deflect responsibility by directing those in need of mental health services, including Ms. Jaddo, to contact third-party urgent care facilities instead of 911. They continued to do so even though they knew that those facilities in Stamford all closed before 6:30 pm.

161.     It is well known that mental health crises may occur at any time of day, especially for those with psychiatric disabilities. Nevertheless, Defendant City failed to provide accommodations to ensure that those with psychiatric disabilities would have adequate access to mental health care including during police interactions.

162.     Defendant City also violated the ADA by failing to accommodate Mr. Barrier's disability through refusing to complete a Conn. Gen. Stat. §17a-503 Police Emergency Evaluation Request, which was required to transport Mr. Barrier to a hospital. Defendant Police officers had actual or constructive knowledge that Mr. Barrier needed urgent psychiatric care but failed to take

such need seriously because of their dismissive attitude toward Mr. Barrier's mental disability.

163.    Defendants violated Mr. Barrier's rights when they failed to follow the Connecticut CIT training standard of care, making it exceedingly more difficult for Mr. Barrier to understand the situation given his schizophrenia. Defendant Police officers, in chasing Mr. Barrier, being aggressive, and failing to deescalate the situation, contributed substantially to his confusion and helplessness.

164.    Defendant City violated Mr. Barrier's civil rights under the ADA by failing to adequately train Defendant Police officers to make reasonable accommodations for persons suffering or perceived to be suffering crisis from mental illness or disabilities when they are either arrested or taken into custody, under Conn. Gen. Stat. Ann. § 7-294s and 28 C.F.R. § 35.130(b)(7).

165.    Defendant City violated Mr. Barrier's civil rights under the ADA by criminalizing his conduct as that deserving a violent arrest rather than a mental health crisis.

166.    Defendant City violated Mr. Barrier's civil rights under the ADA by failing to conduct a self-evaluation of its existing policies and procedures to ensure that its Police Department's practices were ADA compliant.

167.    As a result of the aforementioned violations, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

168.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and economic injuries in an amount to be determined at trial.

**FIFTH COUNT**
**(Deprivation of Civil Rights Pursuant to § 504 of the RA, 29 U.S.C. §§ 701 *et seq.*)**
**(By Plaintiff Jaddo in her Representative Capacity**
**As to Defendant Town and City of Stamford, Connecticut)**

169.    Plaintiffs repeat and re-allege each and every one of the preceding allegations

contained in this Complaint.

170.    Defendant Police officers, as agents, servants, and employees of Defendant City violated Mr. Barrier's rights under the RA through the facts described above.

171.    Defendant City is a recipient of federal financial assistance under Section 504 of the RA, 29 U.S.C. § 794.

172.    A Defendant Officer's statement, captured on video, where he told another officer to take Mr. Barrier to the precinct instead of a hospital because "he is psychotic. Nah, he's going to jail," is a prime example of Defendants' deprivation of needed services to Mr. Barrier because of his disability. In other words, Mr. Barrier was denied life-saving medical treatment that could have prevented his premature death for no other reason than that he is "psychotic." Defendants made a conscious and deliberate choice to arrest Mr. Barrier and treat him like a criminal instead of providing him with medical assistance because Mr. Barrier was "psychotic."

173.    Defendant City violated Mr. Barrier's rights under the RA by failing to provide adequate reasonable accommodations including ready access to psychiatric services to citizens in mental health crises.

174.    Defendant City had a routine practice of letting police officers and 911 dispatchers deflect responsibility by directing those in need of mental health services, including Ms. Jaddo, to contact third-party urgent care facilities instead of 911. They continued to do so even though they knew that those facilities in Stamford all closed before 6:30 pm.

175.    It is well known that mental health crises may occur at any time of day, especially for those with psychiatric disabilities. Nevertheless, Defendant City failed to provide accommodations to ensure that those with psychiatric disabilities would have adequate access to mental health care including during police interactions.

176.     Defendant City also violated the RA by failing to accommodate Mr. Barrier's disability through refusing to complete a Conn. Gen. Stat. §17a-503 Police Emergency Evaluation Request, which was required to transport Mr. Barrier to a hospital. Defendant Police officers had actual or constructive knowledge that Mr. Barrier needed urgent psychiatric care but failed to take such need seriously because of their dismissive attitude toward Mr. Barrier's mental disability.

177.     Defendants violated Mr. Barrier's rights when they failed to follow the Connecticut CIT training standard of care, making it exceedingly more difficult for Mr. Barrier to understand the situation given his schizophrenia. Defendant Police officers, in chasing Mr. Barrier, being aggressive, and failing to deescalate the situation, contributed substantially to his confusion and helplessness.

178.     Defendant City violated Mr. Barrier's civil rights under the RA by failing to adequately train Defendant Police officers to make reasonable accommodations for persons suffering or perceived to be suffering crisis from mental illness or disabilities when they are either arrested or taken into custody, under Conn. Gen. Stat. Ann. § 7-294s and 28 C.F.R. § 35.130(b)(7).

179.     Defendant City violated Mr. Barrier's civil rights under the RA by criminalizing his conduct as that deserving a violent arrest rather than a mental health crisis.

180.     Defendant City violated Mr. Barrier's civil rights under the RA by failing to conduct a self-evaluation of its existing policies and procedures to ensure that its Police Department's practices were ADA and RA compliant.

181.     As a result of the aforementioned violations, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

182.     By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and

economic injuries in an amount to be determined at trial.

## SIXTH COUNT
## (Deprivation of Civil Rights Pursuant to Connecticut State Constitution)
## (By Plaintiff Jaddo in her Representative Capacity As to all Defendants)

183.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

184.    Defendants' aforementioned actions violated Connecticut Constitutional law, including, but not limited to, Article I, §§ 8 and 20 of the Connecticut Constitution and Conn. Gen. Stat. § 7–465.

185.    As a result of the aforementioned violation, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

186.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and economic injuries in an amount to be determined at trial.

187.    The egregious circumstances surrounding the Defendants' treatment leading directly to the death of Mr. Barrier while he was detained in Defendants' custody justify punitive damages.

## SEVENTH COUNT
## (Wrongful Death – Conn. Gen. Stat. 52-555)
## (By Plaintiff Jaddo Individually and in her Representative Capacity
## As to all Defendants)

188.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

189.    This action is brought pursuant to Section 52-555 of the Connecticut General Statutes.

190.    On October 23, 2019, Steven Barrier, Jr. died.

191.    On January 27, 2021, Plaintiff Valerie Jaddo was appointed Administrator of the Estate of Steven Barrier, Jr. by the Stamford Probate Court, State of Connecticut, Court of Probate District No. 55 (Fox, *G*.)

192.    The details above demonstrate how the Defendants failed to provide proper and adequate care and treatment to Mr. Barrier while he was under their custody and control.

193.    As a result of the aforementioned acts and omissions, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

194.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and economic injuries in an amount to be determined at trial.

195.    By reason of the above, Plaintiff Ms. Jaddo Individually seeks to recover damages for non-economic and economic injuries she suffered as a result of her son's untimely death.

## EIGHTH COUNT
### (Negligence)
### (By Plaintiff Jaddo in her Representative Capacity As to all Defendants)

196.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

197.    The details above demonstrate how the Defendants were negligent in failing to provide proper and adequate care and treatment to Mr. Barrier while he was under their custody and control.

198.    As a result of the aforementioned negligence, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

199.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and

economic injuries in an amount to be determined at trial.

**NINTH COUNT**
**(Negligent Hiring, Training, Retention, and Supervision)**
**(By Plaintiff Jaddo in her Representative Capacity**
**As to Defendant Town and City of Stamford, Connecticut)**

200.    Plaintiffs repeat and re-allege each and every one of the preceding allegations contained in this Complaint.

201.    The details above demonstrate how the Defendant City was negligent in hiring, training, supervising, and retaining police officers who failed to meet their duty of care while Mr. Barrier was in their custody and control.

202.    As a result of the aforementioned negligence, Mr. Barrier suffered pain and suffering, emotional distress, and catastrophic injuries, including wrongful death.

203.    By reason of the above, Plaintiff Ms. Jaddo as the Administratrix of Mr. Barrier's estate brings this action to recover damages, both general and special, for his non-economic and economic injuries in an amount to be determined at trial.

**TENTH COUNT**
**(Prayer for Declaratory and Injunctive Relief for**
**Violations of the aforementioned Civil Rights)**
**(By Plaintiff CLRP**
**As to Defendant Town and City of Stamford, Connecticut)**

204.    Plaintiff CLRP repeats, re-alleges, and incorporates by reference each of the preceding allegations in this Complaint as if set forth fully herein.

205.    Defendant City, and its agents, servants, and employees at the Stamford Police Department have a routine policy and practice of violating the rights of individuals living with psychiatric disabilities,  including but not limited to Mr. Barrier, under the Fourth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, ADA, Section § 504 of the RA, Article I §§ 8 and 20 of the  Connecticut Constitution, Conn. Gen. Stat. § 7–465, Conn. Gen. Stat.

Ann. § 7-294r, Conn. Gen. Stat. Ann. § 7-294s, and 28 C.F.R. § 35.130(b)(7) among others.

206.    Co-Plaintiff CLRP has organizational standing to bring this claim on its own behalf to rectify Defendants' unlawful conduct and policies alleged herein as CLRP sustains and continues to sustain direct injuries in carrying out its organizational goals as a result thereof. CLRP brings this action to require that the Defendant City to comply with the applicable constitutional and statutory provisions to the fullest in future police encounters of mentally disabled individuals.

207.    CLRP seeks injunctive relief to enjoin the Stamford Police Department from failing to adequately and reasonably accommodate persons suffering or perceived to be suffering from a psychiatric disability.

208.    CLRP seeks injunctive relief to reduce the number of wrongful deaths and civil rights violations that continue to occur as a result of the Defendants' unlawful interactions with Stamford citizens with psychiatric disabilities on a reoccurring basis.

209.    Defendants' treatment of Mr. Barrier serves as an example of how their unlawful conduct causes grave injury to CLRP's clients—namely, Stamford citizens with psychiatric or mental health disabilities.

210.    CLRP has to divert its limited resources to counteract the Defendant City's unlawful actions that occur on a routine basis presently, including, but not limited to, their actions that led to the wrongful death of Steven Barrier on October 22, 2019 to October 23, 2019.

211.    CLRP is a non-profit organization dedicated to improving the lives of and protecting the civil rights of low-income persons with psychiatric disabilities including in Stamford, Connecticut. All clients and prospective clients of CLRP qualify for protection under the ADA and the RA because they are "individuals with a disability" by definition. 42 U.S.C. § 12102.

212. CLRP's mission is to provide high quality advocacy to persons with psychiatric disabilities related to the treatment they receive by reason of their disabilities.

213. One of CLRP's primary goal is to spend time and resources at satellite offices in mental health facilities throughout the State, including the F.S. Dubois Center in Stamford, to ensure that legal rights of persons in psychiatric facilities are protected throughout the treatment process. CLRP provides legal services and advocacy involving patients' rights.

214. CLRP also represents persons living in the community who receive or are eligible to receive treatment and services from the Department of Mental Health and Addiction Services ("DMHAS") on systemic issues, such as employment discrimination, housing discrimination, denial, or termination of services, and protecting people's civil rights under the ADA, the RA, the state and federal constitution, and state statutes in general.

215. Although CLRP's initial mission was to provide legal aid services to persons receiving treatment and services at mental health facilities and/or persons who require employment or housing benefits as outlined above, CLRP must spend its limited resources to counteract the Defendants' violation of the constitutional and statutory rights of mentally disabled citizens in custodial contexts—*i.e.*, during arrest or confinement in jail.

216. Defendant's routine practice of mistreating individuals with mental health disabilities while in police custody has placed CLRP's clients at a grave risk for serious bodily injury, wrongful death, and unlawful arrest. Defendant's unconstitutional and otherwise unlawful practice of criminalizing mental disability has forced and continues to force CLRP to divert its limited resources including staff time toward lobbying efforts and referral services for arrestees with mental disabilities in order to counteract the Defendant's unlawful actions.

217. CLRP has organizational standing to seek injunctive relief because the Defendant

City's unlawful actions directly injure and will continue to injure CLRP. CLRP seeks to challenge Defendant's policy of criminalizing and mistreating mentally ill arrestees or detainees, as such policy frustrates CLRP's own goals, projects, and mission to protect the civil rights of persons with psychiatric disabilities. CLRP has had to divert significant organizational resources and funds to counteract the Defendant City's unlawful actions and practices, when such resources and funds could have been spent on other activities including, but not limited to, providing legal assistance to clients in non-custodial contexts.

218.    Because of Defendants' routine unconstitutional and unlawful actions, CLRP must expend substantial resources in lobbying efforts specifically intended to reduce the number of individuals living with psychiatric disabilities who are mistreated and brutalized by the police. For example, CLRP has diverted staff time and resources away from providing legal aid to patients in psychiatric facilities to attending legislative notice-and-comment hearing regarding police interactions with individuals with psychiatric disabilities, drafting testimony, attending and testifying at legislative hearings, raising public awareness, and providing guidance as members of the Sandy Hook Advisory Commission and the Board of Directors of the Connecticut Alliance to Benefit Law Enforcement (CABLE)—a coalition of police, mental health professionals, educators, and families living with mental health conditions.

219.    In addition, CLRP expends limited staff time and other resources on lobbying for bills that would counteract the Defendants' actions and protect their constituents' rights under the aforementioned civil rights laws, including HB 5271 titled, "An Act Concerning Mental Health Training In State And Local Police Training Programs And The Availability Of Providers Of Mental Health Services On An On-Call Basis" and HB 5314 to improve police "wellness checks"

when individuals are in psychiatric crisis, and S.B. No. 278 titled, "An Act Concerning Mental Health And Wellness Training And Suicide Prevention For Police officers."

220.    In CLRP's testimony supporting HB 5271, Kathy Flaherty, the Executive Director of CLRP, detailed the primary reason CLRP diverts its time to lobbying as follows:

> According to the National Alliance on Mental Illness, one out of four people killed in officer-involved shootings in the United States is a person with a mental health condition. Data from the ACLU of Connecticut demonstrates that the majority of people who died after being Tased by police in Connecticut were experiencing a mental health or substance-use-related crises. … This bill would also require all police departments to contract with or employ an on-call mental health services provider to be available on an on-call basis, twenty-four hours a day, seven days a week.

*See* **Exhibit B** (CLRP testimony supporting HB 5271).

221.    CLRP has also provided testimony regarding improving police interactions with individuals with psychiatric disabilities to the Police Accountability and Transparency Task Force and the disability subcommittee of the same task force to ensure that the Police Accountability and Transparency Bill protected CLRP's clients during police encounters with individuals in psychiatric crisis.

222.    Moreover, Defendants' unlawful actions have forced CLRP to divert its very limited staff time away from legal matters concerning psychiatric patients to collaborate with "CABLE." According to the Bureau of Justice Assistance within the U.S. Department of Justice, CABLE is the leading organization in Connecticut's statewide efforts to promote specialized policing responses ("SPRs") to people with mental illnesses. *See generally* Bureau of Justice

Assistance, Statewide Law Enforcement / Mental Health Efforts, *accessible at* https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG_StatewideLEMH.pdf, p. 2.

223.    CABLE is an alliance of non-profit organizations that trains police on issues related to mental health. CABLE trains police to use safe and effective strategies to work with people in mental health crises in the community and provide Peer Support Training so police can help each other when a crisis occurs. CABLE has been providing consultation and training since 2003 and has trained over three thousand public safety personnel around the state of Connecticut.

224.    CLRP has diverted its limited staff time and resources to researching a number of first-responder models, becoming well-versed in law enforcement policies and practices, collaborating closely with CABLE, including motivated individuals within police departments and numerous law enforcement professionals and trainers regarding use of force against mentally disabled individuals.

225.    CLRP has also diverted substantial resources to raising public awareness, through media exposure, regarding what necessary legal changes are needed to reduce the number of people with mental disabilities who are gravely injured or killed by the police.

226.    Defendants' unlawful treatment of mentally disabled individuals has also forced CLRP to provide legal aid referral services to clients who were unlawfully arrested, humiliated, and/or brutalized by police when they needed urgent psychiatric care.

227.    As Defendant City continues to engage in recurrent wrongful acts against individuals with mental disabilities, the anticipated expenditures and ensuing harm to CLRP's activities are currently impending. Defendant City's policy has impeded, and will continue to impede, CLRP's ability to carry out its goals and responsibilities.

228.    CLRP's injury will be redressed if Defendant City is enjoined from violating the constitutional and statutory rights of CLRP's clients—individuals with mental disabilities. CLRP will no longer have to divert its limited resources to counteract Defendant's actions and will be able to focus on protecting psychiatric patients' rights in non-custodial settings. Furthermore, if injunctive relief is granted, CLRP's clients will be able to access treatment, recovery, and emergency psychiatric services at centers like F.S. Dubois instead of being unlawfully arrested and brutalized by police who criminalize their psychiatric symptoms.

229.    CLRP seeks declaratory and injunctive relief to prevent future unlawful acts and omissions that occurred herein from occurring to other citizens of Stamford.

230.    Specifically, CLRP seeks declaratory and injunctive relief directing that the Defendant, THE TOWN AND CITY OF STAMFORD, CONNECTICUT's Police Department respond to incidents involving psychiatric emergencies by sending a community-led, non-police, mental health Community Team as primary responders. This community-based response team will approach people in mental health crises with care and connection, not coercion and control.

231.    Thus, CLRP seeks declaratory and injunctive relief directing that Defendant City immediately:

(a) provide necessary monetary funding to create and maintain a community-based mutual aid, a peer-led system that responds twenty-four hours a day and seven days a week to individuals in Stamford with a mental health condition who would otherwise be vulnerable to mistreatment and arrest;

(b) require 911 dispatchers at Stamford to ask all callers if the situation involves a mental health crisis and, if so, to inform the callers of the option to dispatch the community-led crisis intervention team in addition to the police;

(c) mandate police officers to stop arresting mentally disabled individuals for nonlethal actions that directly result from their mental disability and to instead dispatch said community-based response team in first response;

(d) provide individuals who are seeking urgent psychiatric care ready access to urgent psychiatric services that remains available for twenty-four hours a day and seven days a week;

(e) provide necessary monetary funding to create and maintain an organization, managed and operated by people with first-hand lived experience of psychiatric disability, operating 24/7, to provide confidential and individualized support to people in crisis;

(f) require all agents, servants, and employees of Stamford Police Department to receive training on crisis intervention, suicide intervention, and harm reduction, and shall do so from a trauma-informed orientation; and

(g) appoint a Special Master at the Defendants' cost to chair a committee to evaluate, oversee, manage, advise, and direct ameliorative action for mentally disabled residents of the City of Stamford.

232. Notably, it was only after this lawsuit was filed that Defendant City announced that the Stamford Police Department is instituting reforms to incorporate 1) police-mental health collaboration, 2) ongoing mental health crisis response training, 3) a mental health crisis adaptive patrol response program, and 4) the embedding of a social worker with the Stamford Police Department. Moreover, Defendant City announced that the Stamford Police Department has partnered with F.S. DuBois Center, one of the mental health crisis centers where Plaintiff CLRP services patients.

233.     These preliminary changes do not rectify the ways in which Defendant City's unlawful action continues to violate the rights of Stamford's citizens with mental disabilities including clients and prospective clients of CLRP. Without requisite training and sensitivity to mental health crisis, Stamford police still routinely arrests and detains individuals in mental health crisis by mischaracterizing psychiatric symptoms as criminal behavior. In addition, CLRP wishes to ensure that permanent injunction with above-outlined relief will be ordered for an indefinite period, unlike Defendant City's new initiatives that have not received secure funding and may be discontinued at any time.

### JURY DEMAND

234.     Plaintiffs demand a trial by jury as to all counts for which jury trial is available by law.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Valerie Jaddo demands judgment be entered in her favor and against the Defendants awarding:

(a) Compensatory damages for Mr. Barrier's personal injuries, conscious pain and suffering, emotional distress, fear of impending death, wrongful death, economic damages, both general and special, and other harm, in an amount to be determined at trial;

(b) Punitive damages as to the First, Second, Third, and Sixth Causes of Action in an amount to be determined at trial;

(c) Interest to the fullest extent allowed by law, for any and all monetary and/or non-monetary losses;

(d) Costs, expenses, and attorney's fees incurred in this civil litigation to the fullest extent

allowed by law including pursuant to 42 U.S.C. § 1988; and

(e) Such other and further relief at law or in equity that this Court deems just and proper.

**WHEREFORE**, Plaintiff Connecticut Legal Rights Project, Inc. demands judgment be entered in its favor and against the Defendants awarding:

(a) Preliminary and permanent injunctions the Court deems necessary to rectify the acts and omissions alleged herein;

(b) Costs, expenses, and attorney's fees incurred in this civil litigation to the fullest extent allowed by law including pursuant to 42 U.S.C. § 1988; and

(c) Such other and further relief at law or in equity that this Court deems just and proper.

Dated:        New York, New York
              June 30, 2022

Respectfully submitted,

By: _____
Jaehyun Oh, Esq. (CT Bar #31158)
THE JACOB D. FUCHSBERG LAW FIRM, LLP
3 Park Avenue, 37th Floor
New York, NY 10016
Phone: (212) 869-3500, Ext. 245
Fax: (212) 398-1532
J.Oh@Fuchsberg.com


By:_____
Kelly Fitzpatrick, Esq. (CT Bar #29764)
KOSSKOFF KOSKOFF & BIEDER, PC
350 Fairfield Avenue
Bridgeport, CT 06604
(203) 336-4421
KFitzpatrick@Koskoff.com

*Attorneys for Plaintiffs*