# EXHIBIT D

# REVIEW OF THE CIRUMSTANCES LEADING TO THE DEATH OF STEVEN BARRIER

I have written in connection with the case of Steven Barrier. I have reviewed materials regarding this case including police reports, executive summary, police body camera footages, deposition, and other reports and documents. All the opinions herein are to a reasonable degree of professional certainty based on my knowledge and experience in the field of mental health, and my years of experience advising on policing as it pertains to people in crisis.

Steven Barrier was a 23-year-old Black man known by police officer Defendants in this case to have a mental disability. They were informed of this fact by his mother and sister. Stamford police had also had previous interactions with Mr. Barrier that could have provided this information.

Upon the first visit to the home of Steven Barrier and his mother and sister, the officers learned that Mr. Barrier had been recently seen by a psychiatrist and was provided a new medication. The officers told his sister to contact them when Mr. Barrier returned.

At the point of their first visit to Mr. Barrier's home on the night of October 23, 2019, officers were aware that Mr. Barrier had a psychiatric history, and that police would be returning to the scene when Mr. Barrier returned. If a plan been created before arriving at Mr. Barrier's home the second time to take Mr. Barrier to the hospital for a psychiatric assessment, and EMS had been called to the scene, Mr. Barrier would have been less likely to escalate to the point of flight.

In the records I reviewed, there was no indication that any means of calming a person in crisis were employed with Steven Barrier. These methods include: approaching a person in a calm, friendly manner; assuring them that you are not there to hurt them; giving the person some space; explaining what is happening and why. The idea behind trauma informed de-escalation is that people in crisis are often afraid, so intimidating and taking complete control of the person is likely to escalate that fear, which can emerge as fight of flight. In Mr. Barrier's case, it was flight. Chasing him and yelling would only have escalated him further. Issuing commands is not known to de-escalate people in crisis.  Knowing that Mr. Barrier had mental health problems, saying instead that they wanted to help him would have been appropriate.

Police officers pursued Mr. Barrier up a steep hill, where he collapsed on the ground. This was another opportunity to show calmness and care to a man known to have a mental disability. Physical stress in combination with mental distress can be dangerous to physical well being and can be alleviated by placing someone in a position to facilitate breathing, and ensuring that there are no additional stressors on ability to breathe. There was no kind or gentle response to Steven Barrier when he said he could not stand or walk. In fact he was taunted "you want to run, let's run". Instead of compassionately assisting him, he was referred to as needing to be dragged – "let's

1

drag his ass". His hands were cuffed behind him, and he was carried in a prone position, which would have caused physical stress in various ways, and emotional distress. In some police services use of cuffs is discretionary, especially on someone with mental health problems, unless they pose an immediate risk. As Mr. Barrier was being asked why he could not walk, that would seem to contradict a perception of imminent dangerousness. The decision to cuff him and carry him face down rather than call for EMS and a stretcher offered no accommodation for a person with a mental disability, additionally vulnerable from being in crisis and having collapsed following exertion. It seems punitive or rooted in perceptions outside of an humane understanding.

Statistically, there is an increased likelihood that police will use more severe force on people they perceive to have mental health problems. [1]

Individuals perceived to have mental health issues are commonly believed to be relatively dangerous, as numerous studies have shown. Although there is some greater risk for violence in some cases, the risk is small and the majority of individuals with mental health problems are not violent. These perceptions of dangerousness are important in terms of how they can influence other factors such as desire to use force and coercion, and to maintain social distance.[2] Keeping social distance and connecting with a person are mutually exclusive.

People who appear to be in crisis and people who appear to be Black are both subject to attributions of superhuman strength.  In a study by Waytz and colleagues one aspect of this was found to be associated with believing Black people experience less pain relative to White people, which can lead to the assumption that Black people can better endure (or perhaps even require) greater use of force to subdue.[3]

The intersectionality of Blackness and crisis can create an amplification of the perception of dangerousness such that more coercive measures are used to a greater degree than is called for in a given situation.

Additionally, police can be highly sensitive to behaviours that seem to undermine their authority. Accordingly, compliance is often sought in community encounters by the police adopting an authoritarian appearance and communication style. Traditionally,

---

[1] Tribolet-Hardy, F., D. Kesic, S. Thomas. Police management of mental health crisis situations in the community: the status quo, current gaps and future directions. *Policing and Society: An International Journal of Research and Policy,* 2015, 25 (3) p. 297

[2]   Sowislo, Julia,,Franca, Gonet-Wirz, Stefan Borgwardt, Undine E. Lang, and Christian G. Huber. Perceived Dangerousness as Related to Psychiatric Symptoms and Psychiatric Service Use – a Vignette Based Representative Population Survey**.** Sci Rep. 2017; 7: 45716.

[3] Waytz, Adam. K. Hoffman, S. Trawalter. A Superhumanization Bias in Whites' perceptions of Blacks. 2014

DocuSign Envelope ID: EP877E91-6536-448E-A6B1-9C3469915EB

police have approached community encounters with a need to come in strong, and to resolve things quickly.[4]

When people are in distress they can appear to be ignoring instructions, when they are actually not taking in what has been asked of them, or may be otherwise unable to comply.[5] In policing this can be interpreted to be defiance, which can lead to an escalation to more coercive tactics.[6] This in turn typically aggravates the encounter which escalates the person (causing fight or flight) such that even more coercive measures are then used[7].

In mental health de-escalation training, there is now an emphasis on trauma informed practices. This is due to the overwhelming evidence that most people with mental health and/or substance use issues are survivors of trauma.

When Steven Barrier was carried down the hill and placed on the wet ground, he did not receive accommodation for his mental or physical state. Instead of being transported to the hospital to assess his wellness, he was described as psychotic and schizophrenic, following this with saying that he was not going to the hospital, but rather to jail, which is the opposite response that should have been made to that information. He was asked if he was going to walk in or be tossed into car, despite his head lolling and blood on his forehead. A decision was made to take no action such as calling EMS or transporting Mr. Barrier to the hospital, but instead to take him to the police station. This decision, rooted in a failure to compassionately accommodate Mr. Barrier's mental disability at all, led to the lack of medical care that could have saved his life.

When Mr. Barrier was taken to the police station no one took clear responsibility for him, despite his being in police custody and unable to help himself. Mr. Barrier was clearly in a serious state, barely conscious and barely responsive at best, and time was spent considering whether he was faking that could have been spent calling EMS and saving his life.

---

[4] F. de Tribolet-Hardy et al., 296-297

[5] Ibid, 297
[6] Ibid
[7] Ibid, 299

3

## INTERVENTIONS FOR A DIFFERENT OUTCOME

1. Given the volume of calls the police department had that were mental health related, every officer and their communications/dispatch staff, should have:

   - been trained to recognize when a mental health issue was involved
   - taken note of it when it was clearly stated
   - recorded it such that the information would be available to officers following up
   - been aware of the options available to attend to a member of the public with a mental health crisis at any time of the day or night.

2. Every officer needed to be trained in trauma informed de-escalation skills. This training would have correspondingly included what would be likely to escalate a situation.

3. Antibias training is also essential. There are commonly held biases toward people with mental health issues. There are also numerous stereotypes held broadly toward Black men. These biases overlap in some areas, such as the perception that people are stronger and more dangerous than they are, as well as attributing reduced credibility. Police department members are not necessarily more biased than many other members of society, but they have powers greater and potentially more devastating than others, so it is essential that biases be addressed. If they had been, Steven Barrier would likely have been taken at this word when he said he could not walk. He would not have been hauled down the hill as if he was simply resistant when he said he could not walk, and left on the ground beside the car. He would have received medical attention when flailing in the back of the police vehicle. And instead of being taken to the station, he would have been taken to the hospital, for physical and psychological evaluation. At the station, he would have received immediate medical attention when he became unconscious. It is difficult to find any reasons for this behaviour other than a punitive attitude toward a Black man with a mental disability, a failure to accommodate to an extent that amounts to discrimination against Mr. Barrier, reaching a lethal level.

4. Training needed to be mandatory. Often those who need it the most are the least likely to volunteer to be educated.

5. For the Stamford Police Department to be an effective public servant of the community, there should be a referral relationship between the Service and the local community and hospital resources that could assist and assess a person in crisis. Officers would be aware of the hours and capacity of the mental health services, hospital and social services in the area, and could have arrangements with services for accommodation when bringing people in for assessment and/or care.

DocuSign Envelope ID: EB877E91-6536-448E-A6B1-9C34690175E0

6.  If police data was tracked by the City, it would have been apparent that many calls most appropriately addressed by a 24/7 community-based mental health/crisis service were instead being responded to by police. This creates an obvious greater likelihood of force and/or inappropriate custody being used on a person with a mental disability (especially with officers untrained in mental health) and of an encounter escalating instead of de-escalating.

7.  There are numerous points in Stamford Police Service's encounters with Stephen Barrier on the night he died that could have prevented the loss of Stephen's life if done differently:

    - If crisis services were available that could have attended on a call, or accompanied police on a call, the escalation of the situation and failure to get Stephen medical attention could have been avoided. Peer run crisis services, especially with a peer run respite centre available, are particularly effective as they are often services that people in crisis actually want to use and will seek out for help themselves.
    - Trauma informed de-escalation skills could have informed officers' approach to Stephen beyond chasing him and yelling. For example, they could have asked if they could help him.
    - A trauma informed and disability accommodating approach entails respect for the limitations that people identify that they have, such as being unable to stand up and walk. It means recognising that people's response to a situation can be much stronger and fear filled for trauma survivors, with physical ramifications, and that most people with mental health issues are trauma survivors. And it requires a response designed to enhance the person's sense of safety as much as is possible - if there are no immediate safety concerns - which there were not in Stephen's case.
    - If Stephen's mental state was responded to as a condition requiring a health-based response, not criminalized and treated as deserving of jail, he would have been taken to a hospital and survived.
    - If his verbal and physical expressions of distress in the police car were taken for what they were and responded to, the car would have stopped at the hospital instead of continuing to the police station.
    - If dishonesty was not attributed to his deteriorating condition at the police station, emergency medical services would have been contacted immediately rather than jesting about how to assess it he was really unconscious.

# RECOMMENDATION FOR A DRAFT STAMFORD POLICE DEPARTMENT MENTAL HEALTH AND ADDICTION STRATEGY

**Recommendation of the Incident Review Panel:**
**Policies**

p. 7 "…there needs to be a written policy on mental illness. Further, policies should be created that are forward looking and relevant to recently identified issues."

Pursuant to this recommendation of the Incident Review Panel, outlined below are my proposals for a written policy on mental health that would be appropriate for the Stamford Police Department to adopt.

### Mental Health and Addiction Strategy for the Stamford Police Department

***Draft***

Introduction:

This Mental Health and Addiction Strategy is a commitment to preserving the health and safety of both members of the community and members of the police service.

It incorporates a people-focused approach which includes a comprehensive system of data measurement and a clear articulation of operational outcomes.

Responding to people who appear to be experiencing mental health and/or addiction issues is one of the most important aspects of policing today, while recognising that the police are often not the best service to respond. The Board will consult with the Stamford community about a draft Strategy, especially organizations representing people with lived experience of mental health and addiction issues and the Black community. To advise the Board on policy on an ongoing basis two Advisories will be created: The Mental Health and Addictions Advisory Committee (MHAAC), and the Anti Racism Advisory Committee (ARAC). The intersection of being in crisis and being Black is a particularly vulnerable place to be in relation to police use of force, and will deserve special attention.

The MHAAC would oversee the development and implementation of the Stamford Police Department's Mental Health and Addiction Strategy.

Stamford PD will assign the mental health portfolio to a senior member of Command to ensure implementation of all recommendations, and this member would work in partnership with a Special Master representing the community.

**Draft Elements of the Strategy:**

Training and Education on Trauma Informed De-escalation

Training and procedures will be reviewed regularly by Stamford PD and MHAAC to ensure trauma informed de-escalation is a top priority.

Training will incorporate how perceived mental health, race, cultural identity, and/or other identities may influence a police officer's decisions and actions with regard to use of force.

Training will include information about how most people with mental health or addiction issues are survivors of trauma, and that this is a factor necessary to understand to effectively de-escalate situations. (For example, running or apparent aggression is often an expression of fear, so being nonthreatening will be calming while being overly controlling or threatening will escalate the person.)

Officers will receive training in relation to bias, both conscious and unconscious, including discrimination toward persons with a mental disability, and racism, and how to address the issues in terms of how it affects judgement and decision-making. Training will include how to offset and challenge bias.

Stamford PD acknowledges and provides learning opportunities regarding the impact of intersectionality - additional equity issues that in combination and addition create unique challenges in people's experiences and in how they can be perceived (e.g. race, class, gender identity).

Skilled community members with lived experience of mental health and/or addiction issues (e.g. members of peer run organizations), members of racialized communities, and other subject matter experts will play a pivotal role in the development, delivery, and review of training.

Officers will receive de-escalation training, using both classroom and scenario-based training. Police officers will be assessed by trainers with respect to competence in de-escalation, and failure to show competence will result in the police officer being unable to assume front-line duties until they pass the training.

Officers will receive training in cultural competence and anti-Black racism and will demonstrate an understanding in order to pass the training.

Training scenarios will emphasize the importance of assessing and reassessing situations.

Training will cover the importance of planning in a crisis situation, of coordinating response and identifying a lead.

A method will be developed or identified to objectively measure the effectiveness of officer training (both initial and continuing) for unconscious bias, mental health issues, de-escalation and use of force. Officers should be tested, graded and must meet a benchmark in order to pass.

New recruits and experienced officers will be provided with training on techniques for containing crisis situations, including, wherever possible, slowing down the course of events and permitting the involvement of mental health teams if needed.

Training will include ongoing Emergency Medical Response certification, including CPR and positioning to facilitate breathing (often called the rescue or recovery position). They will also learn that psychiatric medications and extreme stress can create physical vulnerabilities.

Communications Operators will be trained in de-escalation, how to extract accurate information, and the importance of language on officers' expectations.

Stamford PD's Senior Management and Command Team will receive mental health and addiction awareness training and receive annual information sessions on how to support the implementation of this Strategy.

All police service members and emergency communications workers will learn of local mental health resources, their availability, and means of referral.

<u>Supervision and Leadership</u>

Undertake a structural/cultural review and analysis to ensure that Stamford PD has a clear policy with respect to serving and protecting persons with mental health or addiction issues and/or racialized persons, Black persons in particular. The Chief's review and analysis should include input from experts in this field together with persons in the communities falling within the above-mentioned descriptors. Following this, the Chief shall clearly state the policy and communicate it in detail to all officers and employees. The Chief shall ensure that all members through continuous training have a clear understanding of the Chief's mandate in this regard. Failure to follow the Chief's mandate should have consequences and sanctions.

Officers' competency in de-escalation and demonstration of unbiased policing will be incorporated into Performance Appraisals.

Stamford PD will develop a means of collecting aggregate data on supervisor assessments of members regarding interactions with people who may be experiencing mental health and/or addiction issues, and the quality of interactions with members of Black and other racialized communities.

Stamford PD will ensure that Members in a supervisory role monitor and assess the effectiveness of Members in responding to people who appear to be experiencing a

DocuSign Envelope ID: EB877E91-6536-44F5-ACB4-9C346991F5E9

mental health and/or addiction issues, utilizing material collected such as body worn camera footage to assess on the job behaviour.

When making decisions about promotions, supervisors should consider an officer's skill and experience in dealing with Emotionally Disturbed Persons (EDPs) also called Persons in Crisis (PIC), members of the Black community and other racialized communities, including officers' ability to de-escalate and negotiate during crisis situations.

Recruitment

Stamford PD's hiring practices will prioritize recruits who respond with respect and empathy to people experiencing mental health and or addiction issues, who have an anti-racism and anti-oppression perspective, and an understanding of the social determinants of health.

Service Member Wellness

Internally, Stamford PD will promote and make accessible Officers' access to mental health and/or addiction services and promote the development of a Officer peer support option.

Partnerships

Stamford PD will develop means to facilitate referrals by Officers to community agencies.

Stamford PD will partner with key stakeholders to advocate for increased funding and service expansion of programs that are identified as needed by the community of people with mental health and/or addiction issues, such as community-based, non coercive, 24 hour crisis services and a peer run respite centre.

Stamford PD will work with the City to allocate funds to crisis services that will provide an alternative to calling police when people are in crisis, and funding could be reallocated from police services to this end.

Data Collection and Analysis

Stamford PD will produce an annual analytical assessment of use of force in relation to people perceived to have mental health and/or addiction issues, and analyse intersectional data on race/mental health issues/use of force.

Stamford PD will collect qualitative and quantitative data about police interactions with people who appear to be experiencing mental health and/or addiction issues.

Stamford PD will develop means to track referrals by Officers to community agencies.

Stamford PD will collect qualitative and quantitative data about police interactions with community members who are Black, and analyse race-based data on police use of force.

Stamford PD will develop ways to learn from interactions with individuals who might be experiencing mental health and/or addiction issues through the analysis of data collected.

Stamford PD will prepare an Annual Report on the implementation of this Strategy that will be a public document.

### Alternatives to Police: Crisis Services

*Peers are defined here as people with personal experience of mental health or addiction issues, who can possess a variety of skills in addition to their lived experience.*

1. A warm line - 24/7 phone line offering support to people with mental health issues, staffed by peers.
2. Community based crisis stabilization center - a noncoercive, holistic, community rooted crisis centre for immediate assistance for a short period of time. Significant involvement of crisis workers who reflect the community they serve e.g. lived experience of mental health issues, racially, culturally, and linguistically diverse.
3. Community-based mobile crisis team to go on calls to people in crisis instead of police i.e. when there is no immediate threat of violence. Can also accompany police on some calls and advise on police only calls.
4. Crisis worker who works for a crisis centre stationed at 911 call center to take calls when appropriate.
5. Peer respite center – an alternative to psychiatric hospitalization run entirely by peers.

Submitted by
Jennifer Chambers
June 23, 2022

DocuSigned by:

*Jennifer Chambers*

0B8A11313C0A49B...

10

# Exhibit E

**JENNIFER CHAMBERS**
1A Midburn Ave., Toronto, Ontario
jchambers.EC@gmail.com  416-831-0841

## WORK EXPERIENCE

**Empowerment Council**                                                      2003 to present
**Executive Director**
*Advocacy*
- Negotiate client rights on systemic level at the Centre for Addiction and Mental Health
- Advisor to CAMH on policy development and implementation
- Presentation of client perspectives to CAMH, standing committees of government, media
- Facilitate legal cases for EC: intervener status in Charter cases, standing at inquests
- Enhance client decision-making at CAMH

*Education*
- Partner with CAMH in educational initiatives such as: Prevention and Management of Aggressive Behaviour, Mental Health Training for Correctional Officers, Online curriculum
- Educational sessions on rights CAMH and elsewhere: CAMH Bill of Client Rights, Mental Health Act, case law e.g. Winko, etc
- University and college classes
- Public speaking
- Author and co-author research articles, book chapter, editorials

*Research*
- Co-investigator in six CIHR funded studies.

*Community and Organizational Development*
- Organize focus groups and other meetings for clients, General Meetings for members
- Develop budget, update bylaws, negotiate Funding Agreement, etc.


**Police and Community Engagement Review (PACER) - Advisory to Toronto Police Chief - Member**
PACER 1.0 After internal and external consultations, the PACER committee submitted recommendations intended to address bias-free delivery of policing services then engaged in ensuring implementation.                                    2013 - 2017
PACER 2.0 Chief reconvened PACER to advise on "Police Reform in Toronto: Systemic Racism, Alternative Community Safety and Crisis Response Models and Building New Confidence in Public Safety."                               2020 - present
Subcommittee "Know Your Rights" developed educational videos for community on rights related to police. JC wrote script for legal rights on mental health calls. 2021 – present


**Mental Health and Addiction Advisory Panel to the Toronto Police Services Board**
**Co-Chair**                                                            2019 - present
Review Implementation of Toronto Police Service Mental Health and Addiction Strategic Plan
Mental Health and Addiction Committee of the TPSB - Member then Co-Chair  2009 – 2019
Reviewed and developed police training materials, developed Strategic Plan


**Anti – Racism Advisory Panel to the Toronto Police Services Board**      2018 -present
And sub-committees **Member**


**Human Rights Legal Support Centre**                                2019 – 2020
**Expert Witness** in two cases regarding mental health, anti Black racism and policing.

**Humber College**                                              Jan 2013–Dec 2014
**Professor**
Community Justice Services
Special Needs Offenders

**Standing Senate Committee on Social Affairs, Science and Technology**  Sept 2005
**Reviewer**: Mental Health, Mental Illness and Addiction Online Consultation

**Mental Health Legal Advocacy Coalition**                        2001-2004
**Co-Founder and Chair** supported intervention in Court cases, standing at inquests
**Co-author and researcher** national survey of people found Not Criminally Responsible about experience and evaluation of forensic mental health system. Funded by Canadian Court Challenges Program.

**Centre for Addiction and Mental Health**                       2000 to 2003
**EMPOWERMENT FACILITATOR**
*Community and Organizational Development*
- Outreach, membership development
- Organized founding meetings of Empowerment Council and Family Council
- Organized consultations, focus groups, general members meetings, Annual Meeting, etc.
- Develop Memoranda of Understanding, Incorporation, budgets, Bylaws, Operating Plan

*Advocacy*
- At CAMH: extending client rights, enhancing client participation and compensation, extend independent advocacy services, maximize client benefit in policies etc.
- In community: deputations to federal Standing Committees of House and Senate, developed report Alternatives to Use of Lethal Force by Police with Urban Alliance on Race Relations, client position to City and Ministry of Health on CAMH redevelopment, feedback to Toronto Mental Health Implementation Task Force, support Supreme Court intervention, etc.

*Educational*
- AT CAMH: Empowerment Course, Understanding the Needs course, sensitization/staff education, distribution of Empowerment Checklist, facilitating education by clients, etc.
- Public: biweekly classes for Toronto Police Service, International Empowerment Conference, IAPSRS workshop, university classes, mental health law (the reality) for lawyers, etc.

**Queen Street Patients Council**                                1993 to 2000
**COORDINATOR OUTREACH/EDUCATION AND ADVOCACY**
*Advocacy:*
- System wide (from institution to provincial legislature) and individual level advocacy, and rights education.
- Achieved intervenor status for organization in court cases and standing at inquests; scientific research for cases and directions to legal counsel (first Charter intervention by c/s organization in Canada, first c/s group standing at an inquest in Ontario).
- Position papers, interviews and articles for council and media relations.

*Organizational and Membership Development:*
- Working with volunteer board, Annual General Meetings, incorporation.
- Conferences, forums, community consultations
- Membership development.
- Successful funding applications

*Educational:*
*Acquired $200,000 Trillium grant to deliver:*
- De-escalation of people in crisis training to the Toronto Police Service members
- Presentations to mental health services, general public, peer groups, Standing Committees of the government, etc.
- Delivered province-wide education and training program regarding mental health issues: legislation (rights), advocacy, social science/medical research (e.g. treatment outcomes), anti-discrimination and self help.


**Ministry of Health Steering Committee**                                    1992 to 1993
**ORGANIZATIONAL AND COMMUNITY DEVELOPER**
- Pilot Patient Council Project; Organized founding meeting of Q.S.P.C.
- Community consultation, analysis of process and issues of project


**Queen Street Mental Health Centre and Leadership Project**         1991 to 1992
**CONSULTANT AND COMMUNITY ORGANISER**
- Founded consumer/survivor group at Queen Street, Chaired weekly meetings
- Outreach, consultations with psychiatric c/s's, created recommendations in document "Can Queen Street Be Made User Friendly?"


**Ontario Psychiatric Survivors Alliance**                                        1991
**ALTERNATIVES FACILITATOR**
- Facilitated peer support groups for psychiatric survivors, taught peer counseling, wrote articles, community consultation.


**Gerstein Centre**                                                            1990 to 1992
**CRISIS WORKER (Relief Work)**
- Telephone, mobile team, in house support


**Private Practice**
**SUPPORT GROUP FACILITATOR**
- Facilitated support group for Mental Health Oppression Survivors   1988 to 1994
- Facilitated support group for survivors of sexual abuse            1988 to 1990
- Facilitated support group on "Addictions"                                1989
  to 1990
**COUNSELOR**
- Individual and couples counseling.                                 1988 to 1994
**TEACHER PEER COUNSELING**
- Weekly classes for 12 weeks                                        1988 to 1994


**Ontario Institute for Studies in Education, University of Toronto**   1988 to 1989
**WRITER/RESEARCHER**
- Research for Curriculum Unit: A Guide to the Science of Sex and Gender.


**Counseling and Development Centre, Psychology Department, York University**
**INTERN**                                                           1986 to 1987
- Counselor in individual sessions, participant in team meetings.


**Clarke Institute**                                                 1984 to 1985
**RESEARCH ASSISTANT**
- Forensic Research Project – Erotic Violence Syndrome.
  Assisted in research design, data analysis and data collection.


**Women's Studies Department, University of Toronto**               1982 to 1987
**TUTORIAL LEADER**
- Course: "Scientific Perspectives of Sex and Gender"- an analysis of the quality of scientific method in gender-based studies in Psychology, Anthropology and Biology.
- Taught three tutorials weekly. Graded papers, tests, and exams. Annual lecture.

.

**Secretariat of Justice, Ontario Government, Queen's Park**          1980
**RESEARCHER/WRITER AND ANALYST**
- Analyzed services available to Victims of Sexual Assault: judicial, policing, health, advocacy
- Research and recommendations for changes in services, supports and "Rape Kit"

**Child in the City Project, University of Toronto**          1979
**INTERVIEWER**
- Interviews with parents about time with children, resources required.


**EDUCATION**

**University of Toronto**
Honours Bachelor of Science: Psychology

**York University**
Master's Clinical Psychology (All But Thesis)


**JUDICIAL INTERVENTIONS, LEGISLATIVE DEPUTATIONS, AND TESTIMONY**


**Human Rights Tribunal:**
2019 – 2020
JKB - Expert Report and Witness
*Case of Black child handcuffed by Peel police.*
Reid – Expert Report
*Case of CEW use on Black man in crisis by OPP*

**Inquests:**
*Jennifer Chambers initiated the first standing at an Inquest in Ontario by an organization of people currently or formerly with mental health issues, subsequently facilitating standing at numerous Inquests. Facilitation/supervision consists of: deciding on cases for which to seek standing; reviewing and making recommendations regarding witnesses; reviewing and working with legal counsel on cross examinations; preparing and delivering testimony and responding to cross examinations; preparing, advising on joint slate negotiations, and making final decisions on recommendations to go to the jury.*

Facilitated EC position and testified at Inquest into the death of Marc Ekamba, 2022
*Black man shot by Peel police*
Facilitated EC position on preinquest motion for Beau Baker Inquest, 2019
*Motion regarding release of police identity.*
Facilitated Standing of EC at the Inquest into the death of Bradley Chapman, 2018
*Death of opioid overdose while Toronto Police Service (TPS) attending.*
Advised and partnered with Coalition with Standing at the Inquest of Grant Faulkner, 2018
*Death of a man who was homeless and had an opioid addiction.*
Testified at the Inquest of Jermaine Carby, 2017
*Black man with mental health issues shot by Peel police.*
Facilitated standing and testified at Inquest of Nokolaos Mpelos, 2017
*Man who died in restraints at St Joseph's Health Centre*
Facilitated Standing of EC and Testified at the Inquest of Michael MacIsaac, 2017
*Man in post epileptic state shot by Durham police while naked and holding a table leg.*
Facilitated Standing of EC and Testified at the Inquest of Andrew Loku, 2017
*Black man in crisis shot by TPS.*
Facilitated Standing of EC and Testified at the Inquest of Steve Mesic, 2014
*Man in crisis shot by Hamilton police.*

Facilitated Standing of EC and Testified at Inquest of Charlie McGillivary, 2014
*Hard of hearing man with intellectual disability died during take down by TPS in case of mistaken identity.*
Facilitated Standing of EC and Testified at Inquest of Reyal Jardine-Douglas, Sylvia Klibingaitis, Michael Eligon, 2014
*Three people (2 Black men and 1 White woman) shot by police when holding edged weapons in 3 separate incidents.*
Facilitated Standing of EC at Inquest of Ashley Smith, *2014*
Facilitated joint standing with Criminal Lawyers Association and EC at Inquest of G.A., 2013
Facilitated Standing of EC and Testified at Inquest of Jeffrey James Inquest, 2008
*Black man who died in restraints at Centre for Addiction and Mental Health.*
Facilitated Standing of EC and Testified at the Inquest into the death of Otto Vass, November, 2006
*Man with mental health issues who died during beating with baton by TPS.*
Facilitated Standing of QSPC and Testified at the Inquest into the death of Wayne Williams, June 2000
*Black man shot by TPS.*
Facilitated Standing of QSPC and Testified at the Inquest into the death of Edmond Yu, March, 1999
*Chinese man shot by TPS.*


**Intervenor Status in Canadian Charter of Rights and Freedoms Cases:**
Jennifer Chambers initiated the first intervention in a Charter case by an organization of people currently or formerly with mental health issues, and went on to facilitate the following interventions:

➢ Winko (and LePage) *Charter Challenge of indefinite NGRI system. SCC ruling described how system should and had to operate to not violate the Charter.*
➢ Tulikorpi (and Pinet) *used Winko to argue least restrictive applies broadly. Won at SCC.*
➢ Starson *right of capable person to refuse treatment. Won at SCC.*
➢ Mazzei *used Winko to support right of NCR to receive treatment they require (in this case aboriginal healing). Won at SCC.*
➢ Tranchmontagne (and Werbeski) *won in 2 cases:*
 *1st established requirement that federal and provincial legislation must comply with Charter and provincial Human Rights Code*
*2nd required Ontario to withdraw legislation that had excluded people with addictions from receiving Ontario Disability Support*
➢ Thompson and Empowerment Council
*EC a party. Court asked to rule on Community Treatment Orders and Box B criteria violating the Charter. Lost at Province.*
➢ G vs Ontario, *Ontario Court of Appeal win - ruled in favour of people absolutely discharged as NCR having the right to appeal placement on sex offender registry.*
➢ Northern Regional Authority versus Horrocks *lost at SCC on right to access human rights process during labour arbitrated hearing*
➢ Sullivan and Chan and additional case Brown *Charter challenge of constitutionality of excluding extreme intoxication as a defense in certain limited circumstances. Won at SCC.*


**Submissions and Deputations**

Deputations to Toronto City Council Executive Committee 2021 and 2022 on community-based crisis services as an alternatives to police response.

Regular deputations to Toronto Police Services Board as Co-Chair Mental Health and Addiction Advisory Panel to TPSB    2019-2022

Submission to Ontario Legislative subcommittee on Ontario Police Services Act, 2019

Deputation and Submission on Safer Ontario Act, Ontario Legislative Subcommittee, February, 2018

Deputation to Toronto Police Services Board on expansion of CEWs, February, 2018

Centre for Addiction and Mental Health & the Empowerment Council's Joint Submission to The Government of Canada on Canada's National Housing Strategy October 21, 2016

The Centre for Addiction and Mental Health and the Empowerment Council: Joint Response to Ontario's Basic Income Pilot Consultation January 31, 2017

Submission by EC, by EC jointly with CAMH on mental health provisions, and joint submission with Human Rights Commission to Ministry of Community Safety and Correctional Services on Strategy for a Safer Ontario May 2016

Submissions by EC to MCSCS on draft changes to the Provincial Police Services Act, 2015

Submission and meeting with Justice Iacobucci on Review of Toronto Police Services pertaining to mental health matters, 2014

Deputation to Toronto Police Services Board, April 2012

SUBMISSION TO THE LAW COMMISSION OF ONTARIO
On the Law as it Effects Persons with Disabilities, November, 2011

Submission and Deputation to Standing Committee of the Legislative Assembly of Ontario on Social Policy, "Local Health System Integration Bill 36, Local Health System Integration" Wednesday February 8, 2006

Submission at MENTAL HEALTH COMMISSION OF CANADA: Stakeholder Consultation Session, October 10, 2007

Submission and Deputation to Standing Senate Committee on Legal and Constitutional Affairs "Submission on Bill C-10: An Act to Amend the *Criminal Code* (Mental Disorder) and to make Consequential Amendments to Other Acts" April 20, 2005

Submission and Deputation to Standing Senate Committee on Social Affairs, Science and Technology
"Advocacy in Mental Health and Addictions" Feb 15, 2005

Submission to Standing Senate Committee on Social Affairs, Science and Technology
"Injustice in the Forensic Mental health System" Feb 16, 2005

Submission and Deputation to Canadian Parliament's Standing Committee on Justice, Human Rights, Public Safety and Emergency Preparedness "Submission on Bill C-10: An Act to Amend the *Criminal Code* (Mental Disorder) and to make Consequential Amendments to Other Acts" Dec 1, 2004

Submission and Deputation to Standing Senate Committee on Social Affairs, Science and Technology "Attitudes and Behaviour Toward People who have been in the Mental Health System: A National Disgrace:" May 14, 2003

Submission and Deputation to the Canadian Parliament's Standing Committee on Justice and Human Rights regarding the "Review of the Mental Disorder Provisions of the *Canadian Criminal Code*", April 2002

Submission and Deputation to the Ontario Parliament's Standing Committee on General Government regarding Bill 68, "An Act to Amend the Mental Health Act and the Health Care Consent Act", May 2000

Submission to the provincial Standing Committee on Social Development regarding Bill 142, "The Social Assistance Reform Act", October 1997

Submission and Deputation to the provincial Standing Committee on General Government regarding Bill 96, "The Tenant Protection Act", August 14, 1997
Submission and Deputation to the provincial Standing Committee on General Government on "Tenant Protection Legislation Directions for Discussion", August 20, 1996

Submission and Deputation to the provincial Standing Committee on Administration of Justice, Regarding Bill 19, "The Advocacy, Consent, and Substitute Decisions Statute Law Amendment Act", Feb. 21, 1996

Community Mental Health Legislative Subcommittee Hearings ("Graham Consultations") Presentations in Hamilton and Toronto, 1990

## **TRAINING \ EDUCATION\CONFERENCES (recent)**

- Know Your Rights Committee Toronto Police Service (PACER) - public education on TPS website - creation of videos explaining rights in encounters with police. JC authored script on mental health 2021-2022

- University of Ottawa law school - upper year seminar class "Law and Psychiatry" April 2021

- Webinar CAMH Bill Of Client Rights - CAMH People and Experience Week, April 2022

- National Advocacy Rights Protection Association "How to Create Change in Police Services: Transparency, Accountability and Reform", Oct 2021

- Training class for staff hired for pilot City of Toronto Crisis Centres, Feb and May 2022

- UK Mental Diversity in the Law Network and Edinburgh Napier Mental Health Capacity and the Law "Vulnerability, Disability, and Criminal Law" Webinar, Jan 2022

- Law and Mental Disorder Association (LAMBDA) "Is it Really a Benevolent Alternative? Considering the Punitive Effects of the 'Not Criminally Responsible on account of Mental Disorder' Verdict', June 2021

- Toronto Conference on Police-Hospital Transitions – "Being Transitioned" 2019

- Addressing Graduating classes of Recruits, Toronto Police College 2019

- Deputations Toronto City Council Executive Committee and Budget Committee, Jan and March 2021

- Educational Video for Dawson College (Quebec) on the Forensic Mental Health System, March 2021

- Conference Canadian Mental Health Association Ontario annual conference "Best Evidence versus Vested/Best Interest" 2019

- Mental Health and Cities Summit, Jennifer Chambers on panel, Wellesley Institute, April 2018, Toronto

- National Conference on Restraints, Mental Health Commission of Canada, Jennifer Chambers keynote speaker, Ottawa, 2018

- Canadian Collaborative Care Conference, *Power for the People,* plenary speaker June 2018, Toronto, Ontario

- Alternatives Conference *Seeking Justice* conference session, July 2018, Washington DC

- Global Law Enforcement and Public Health (GLEPH) Conference, *Empowerment Council and the Toronto Police Service, panel presentation,* Jennifer Chambers*,* October, 2018, Toronto

- GLEPH two - day satellite conference on International Standards for Police Training, Jennifer Chambers address on PWLE and police training, October 2018, Toronto

- Law Society *Access to Justice,* Jennifer Chambers panel member, October, 2018, Toronto

- Classes on Trauma Informed Crisis Interactions for Toronto Police Service Mobile Crisis Intervention Teams 2017-2018
- Reviewed Toronto Police College course materials, viewed case scenarios, reviewed power point and scenario-based training exercises used to educate TPS officers on unbiased policing and interacting with people in crisis or/and with mental health issues 2016-2017
- Advisor to CAMH in development of Trauma Informed De-escalation for Safety (TIDES), education program for CAMH clinical staff and security
- Attend TPS College training scenarios to assist in debriefing TPS students 2017
- "Understanding Lived Experience" course content development. For nonclinical staff and members of the public. Taught three courses with CAMH Health Equity 2016 – 2017

  Created and taught condensed version to CAMH Business Office members May 2017
- Speaker as PACER member to classes at Toronto Police College on unbiased policing 2016-2017
- Mobile Crisis Intervention Teams and backup team members – What you need to know about Trauma, 2015 – 2017

**PUBLISHED**

- Chambers, J. "The Treatment of Sexual Offenders with Medroxyprogesterone Acetate (Provera): A Review of the Research" (Abstract), Canadian Psychology, May 1984, Vol 25 No 2, p. 91
- Phoenix Rising Magazine, Final Edition, Psychiatric Treatment, 1990
- Toronto Star, Op. Ed., "Rights Violations at Queen Street Mental Health Centre", 1993
- ARCHTYPE Magazine: "QSPC Wins Charter Case", 1995, Vol 13, 3, pp. 2627
- Network Magazine "Community Treatment Orders", 1998, Vol 14, 2, p.7
- PPAO 20th Anniversary Journal "Empowerment in Psychiatric Facilities", 2003

- PPAO 25th Anniversary Journal "Empowerment and Recovery – Are They Connected?" May 2008
- Jennifer Chambers, What Do Client Rights have to do with Trauma Informed Care?  In Becoming Trauma Informed, edited by Nancy Poole and Lorraine Greaves, CAMH, 2012
- Authors: Ross Lori, Vigod Simone, Wishart Jessica, Waese Myera, Spence Jason, Oliver Jason, Chambers Jennifer, Anderson Scott, Shields Roslyn, "Barriers and facilitators to primary care for people with mental health and/or substance use issues: a qualitative study", Journal: BMC Family Practice
- "Community Based Research: Partnering with Scientists", by Jennifer Chambers and Mellisa Legge, CAMH/EC publication
- Key Practices for Community Engagement in Research on Mental Health or Substance Use www.keypractices.ca   Lori Ross, Joyce Brown, Jennifer Chambers, Michele Heath, Sheryl Lindsay, Brenda Roche, and Jijian Voronka
- "Where is the client/patient voice in interprofessional healthcare team assessments? Findings from a one-day forum." Sophie Soklaridis, Donna Romano, Wai Lun Alan Fung, Maria Athina (Tina) Martimianakis, Joan Sargeant, Jennifer Chambers, David Wiljer & Ivan Silver, Journal of Interprofessional Care Vol. 31, Iss.1, 2017
- Chambers J. Meaningful Engagement to Save Lives - Working relationship of a service user organisation with police and mental health services. Jennifer Chambers, J Psychiatr Ment Health Nurs. 2021 Feb;28(1):83-89. doi: 10.1111/jpm.12724. PMID: 33320390.
- "City of Toronto needs its own Mental Health and Addiction Strategy" Jennifer Chambers and Steve Lurie, Op Ed Now Magazine Nov 2021

## **AWARDS**

Canadian Mental Health Association Toronto Award, 2020

Mental Health Legal Committee Award, 2017

LAMDA (Law and Mental Disorder Association) Advocacy Award, 2017

Honourary Award from Centre for Addiction and Mental Health (CAMH) Social Worker Professional Services Group 2014

Client Educator of the Year, CAMH, 2013

Ontario Association of Patient Councils for CAMH Bill of Client Rights, 2008

City of Toronto, Unsung Hero Award, International Day for People with Disabilities, 2005